[Crim. No. 3872. Second Dist., Div. One. Oct. 11, 1945.]

THE PEOPLE, Respondent, v. WILLIAM DREYER, Appellant.

Morris Lavine for Appellant.

Robert W. Kenny, Attorney General, and Walter L. Bowers, Assistant Attorney General, for Respondent.

YORK, P. J.—Defendant was charged in count 1 of an information filed by the district attorney with the crime of burglary; in count 2 with assault with a deadly weapon with intent to commit murder, and in count 3 thereof with assault with a deadly weapon, it being charged therein that defendant was armed at the time of the commission of said offenses.

At the conclusion of the trial, the court of its own motion dismissed count 3 of the information, and the jury found defendant guilty as charged in counts 1 and 2 thereof. From the judgment of conviction of the crime of burglary of the first degree and of assault with a deadly weapon with intent to commit murder, as well as from the order denying his motion for a new trial, defendant prosecutes this appeal urging the following grounds for a reversal of the judgment:

(1) That the evidence is insufficient to support the verdict and that the verdict is contrary to the law and the evidence;

(2) That the court erred in its conduct of the case in that it failed to have read back to the jury certain matters which the jury requested to have read to it;

(3) That the court erred in failing to instruct the jury on the question of the mental capacity of appellant.

In his reply brief, appellant presents a new point: That

the verdict of guilty as to the offense charged in count 2 is contrary to law, for the reason that the dismissal of count 3 after the jury was impanelled constituted an acquittal of the charge of assault with a deadly weapon, and "therefore acquitted him of the charge of assault with a deadly weapon with intent to kill."

At about 2:30 o'clock in the morning of May 19, 1944, appellant was arrested as the result of an alleged burglary of a gasoline service station at 8101 Melrose Avenue in the city of Los Angeles. It is disclosed by the record that appellant was working for a theatrical booking agency in Hollywood and was furnished a car and gasoline for use in such employment; that on May 18, 1944, he worked in the office from 9 or 10 o'clock in the morning until 6 o'clock in the afternoon, from which time until the early hours of the next morning he was making the rounds of various night clubs to look for and to sell theatrical talent; that he left the Circle Bar on Hollywood Boulevard about 1:30 a. m. of May 19th to go to the Band Box at Fairfax and Beverly Boulevard. An hour later he was apprehended by the police under the following circumstances:

Mr. H. W. McFee, a night watchman in the employ of a detective agency guarding business houses and defense plants, arrived at his home about 2 a. m. of May 19th, and was pouring himself a cup of coffee when he heard the sound of crashing glass. He stepped to a window in his house which faced the service station next door and observed an automobile standing by the gas pumps. He immediately picked up his .45 Smith & Wesson revolver and ran over to the station which was in darkness. From light shed by an ornamental lighting fixture on the corner, Mr. McFee was able to see that the door of the station was open and the glass thereof broken. He also observed a man, whom he later identified as the appellant, standing inside but was unable to get a look at his face, so he called to him to "come out," whereupon appellant stepped to the door holding a nickel-plated revolver in his left hand. McFee told him to "come out with your hands up," whereupon appellant made a break and ran out and around the front of the automobile. McFee then ran to the rear of the automobile and back of the gas pumps so that he had three pumps lined up between himself and appellant, McFee being at one end about two feet from the pumps, and appellant at the other end about five feet from the pumps. As appellant ran around the front of the machine, he fired

one shot, and as the two men stood in the positions above indicated they exchanged shots. McFee testified that he fired five shots altogether. "I fired four shots at him and when the third shot that he fired hit me, I fell; I fell over backwards and the gun was discharged in the air"; which exhausted his ammunition. Thereupon, appellant jumped in his car and drove off. In the affray, McFee received a V-shaped wound on the top of his head.

It appears that appellant drove to his room in a Hollywood hotel where he attempted to bandage his arm which had been severely injured, and was attempting to locate a doctor when he was apprehended. He was then driving a black Plymouth coupé bearing a New York license plate and the tire on the rear left wheel was completely off. The officers observing that appellant had been wounded (he having been shot four times in the left hand and arm), called an ambulance and he was taken to a hospital. He wore no coat and a search of his person revealed no firearms.

The owner of the service station testified that he locked the station when he left the night before and when he was called there early in the morning of May 19, 1944, he found the door open and the glass broken. He also discovered that ration coupons for 76 gallons of gasoline were missing from his desk.

Three .38 calibre cartridges were found at the scene and the owner of the station found a .38 calibre bullet under his desk about a month later when he was moving things around in his office. Appellant denied that he ever had a revolver and testified that he had been drinking at various night clubs on the night in question and had little recollection of what happened during that time, but dimly remembered stopping at a service station for air for his tires.

Appellant urges that there is no evidence in the record indicating that he intended to burglarize the premises, or that he entered the premises with intent to steal; also that there is no evidence that he stole anything therefrom. He claims that the essence of burglary is entry with intent to steal or to commit some felony and that his testimony that he went into the service station to get some air for his tires stands unrebutted.

The evidence is uncontroverted that around 2:30 in the morning, appellant was found inside the service station right after the sound of breaking glass had been heard by the wit-

ness McFee, and that the glass in the door of the station had been broken near the lock. Moreover, when appellant was first questioned by Don J. Bennett, one of the arresting officers, he stated that his name was Ralph Smith and that he did not know what had happened. He then said he would tell what he knew if the officers would not let his parents know; that his name was William Dreyer and that he had broken into the service station and "that while he was in there someone approached and called to him to come out; then he stated that the person who approached started firing at him, and he stated that he had a crank, an auto crank, in his hand and when this person started firing, he threw the crank at him, and thought he hit him, because he fell back. Then he (appellant) stated at that time he jumped in the car and left. . . . He refused to state what he went into the service station for . . . that he did not want to say; that he did not want to incriminate himself." Officer Forbes, who in company with Officer Bohmfalk questioned appellant at the General Hospital on the morning the burglary was committed, testified that appellant admitted to him that he "got into a poker game where I lost all my money"; that later he realized that he didn't have any money, and going out Melrose he saw this oil station and decided he would go in and get some money, because he was broke; that he went in and broke the window with a crank or tire wrench. In explaining what happened to McFee, the night watchman, appellant told said Officer Forbes that "he figured if he could get near the door, hit him over the head with that thing and knock him down, he could make his getaway. . . . He hit the man over the head and the man started in shooting and the man dropped, and he jumped in the car and drove away." Appellant denied that he broke into the station to get some gasoline ration stamps and stated he went in for money. When told that the officers doubted the story about his having a gun because they could not see how he could be shot in the left arm, appellant replied: "Well, I am left-handed." Although appellant claims he went into the service station to get air for his tire, he stated to the police officers that it was after he was shot and was looking for a doctor that he noticed the tire of his car was flat.

 Eliminating appellant's express admissions that he broke into the service station to take some money, and in spite of his story that he had no memory of what he did or was too intoxicated to realize what he was doing, the undisputed facts and circumstances fairly warranted the jury in inferring that

appellant entered the service station with intent to steal or to commit a felony. As was so aptly stated in the case of *People v. Martone,* 38 Cal.App.2d 392, 394 [101 P.2d 537]; "The contention is made by defendant that in order to convict him of burglarious intent, it was necessary to presume such intent. With this we cannot agree. The circumstances surrounding him at the time of his apprehension furnished sufficient evidence, which, if believed by the trial judge, would warrant the inference of intent to commit a burglary. (*People v. Mize,* 80 Cal. 41 [22 P. 80]; *People v. Perini,* 94 Cal. 573 [29 P. 1027].) Certainly, breaking a door of a building belonging to a stranger at 2 o'clock in the morning could not have been done with a view of protecting the property or for any other lawful purpose." (See, also, *People v. Sturman,* 56 Cal. App.2d 173, 180 [132 P.2d 504].)

Appellant argues that there is no substantial evidence in the record that he had a firearm or that he assaulted the night watchman with intent to kill him, or that he fired any shot at him at the time here in question. While it is true that appellant denied that he had a gun, and none was ever produced herein, he admitted that he hit McFee over the head with a crank or tire wrench which was later found in his car.

For the purpose of determining whether the assault was made with intent to commit murder, the character of the instrument, the manner in which it was used, and the purpose to be accomplished, are all to be considered; and where it appears that a purpose to put an officer out of the way with a deadly weapon might have been formed to avoid alarm and pursuit in an attempt to escape, it cannot be said that the verdict is not justified by the evidence. Accepting appellant's version that he struck the night watchman over the head with a tire wrench or automobile crank, it still would support the verdict of guilty and warrant the jury in inferring an intent to commit murder. See *People v. Cook,* 15 Cal. 2d 507, 516, 517 [102 P. 752], where the weapon used was a piece of wood 2x4, about two feet long, in which case it was held that "under all the facts and circumstances of the instant case the questions of the nature of the weapon and the manner of its use in their relation to the crime committed were for the determination of the jury. (*People v. Lee,* 23 Cal.App. 2d 168 [72 P.2d 572]; *People v. Valliere,* 123 Cal. 576, 579 [56 P. 433].)"

In the instant cause, the jury apparently chose to be-

lieve the night watchman McFee's version of what occurred, and, as stated in *People* v. *Corlett*, 67 Cal.App.2d 33, 43 [153 P.2d 595, 964]: "It was the sole province of the jury to determine which person told the truth regarding the circumstances of the affray."

The appellant complains that the court erred in its conduct of the case in that it failed to have read back to the jury the testimony relating to "whether the defendant had and used a deadly weapon." It appears that the jury requested through its foreman, Mr. Berry, that such evidence be read to it, whereupon the court in the presence of appellant, appellant's counsel, as well as the deputy district attorney, made the following statement:

"Now, may I state this to you, Mr. Berry: It will take somewhere about three or four hours to read that testimony, because we could not just pick out that testimony without reading the context along with it. I have talked with the attorneys, both Mr. Bird and Mr. Cochran, one representing the defendant and one representing the District Attorney, and we all agree as to what the effect of that testimony is. Do you think it would satisfy the jury if I made a statement as to what we all agree the testimony was in regard to this weapon situation instead of reading the testimony?

"The Foreman: Yes, your Honor, I think that would greatly simplify it, I am sure, in the mind of every juror. We would like, if it is agreeable to your Honor, to hear the testimony of Mr. McFee.

"The Court: You would like to have that read, anyhow?

"The Foreman: Yes. A Juror: Yes, we would.

"The Court: I will read the statement counsel and I have drafted, as to which we all agree. Mr. McFee testified that the defendant had a gun which he held at his side as he stepped to the door of the service station; that the defendant fired at least three shots from the gun while the defendant was holding the gun in his left hand and standing at a point at the west end of the pumps, and while he, Mr. McFee, stood at the east end of the pumps, that he, Mr. McFee, saw flashes and heard the sound of the explosions; that he was struck on the head and fell to the ground while they were in that position, and he received medical treatment for his head injury.

"The testimony also shows that three .38 caliber unexploded cartridges were found at the service station after the shooting, and also that a piece of metal of a composition similar to the

bullets in the .38 caliber shells was found at the end of the pumps where Mr. McFee was standing; this piece of metal was of a definitely different composition from the bullets fired by Mr. McFee. The defendant has testified that he did not, on the night of May 18-19, have a gun in his possession; that he never has had a gun. The officers' testimony is to the effect that the defendant denied having or using a gun while at the service station, and that he stated to them on one occasion that he struck Mr. McFee with a lug wrench, and on another occasion that he threw a lug wrench at Mr. McFee; that in the conversation of May 29th, the officers showed the defendant the wrench, Exhibit 8, and the defendant stated that that was the wrench he used; the defendant denied in his testimony having told the officers anything about using a wrench, and while he was on the witness stand the defendant denied using any lug wrench, as indicated. Now, would you like some testimony read in addition to that?

"Foreman Berry: I think what you have given us is sufficient.

"The Court: I have tried to give you the ultimate facts on that subject, so far as we could recall them. Mr. Bird also calls my attention to a matter—you might recall it yourselves, but I will mention the matter to you—that the wound on the top of Mr. McFee's head was not a hole in the head but was a wound on the top of the head running, as you recall, from over the right temple, diagonally back, slanting back towards the left ear, sort of a crease or gash wound.

"A Juror: We would like to know in the testimony of Mr. McFee, which he gave to us, when he was wounded whether he at any time lost consciousness. We would like to know what his reply was to that question.

"The Court: I think counsel will agree with me that Mr. McFee testified that after he was struck on the head he lost consciousness for a short time and fell to the ground. Is that your recollection, gentlemen?

"Mr. Cochran: I think his testimony was that he was dazed by the blow and fell to the ground, and that he saw the defendant drive away.

"Mr. Bird: My recollection is that he testified he was dazed but did not entirely lose consciousness.

"The Court: I think that is a better statement of it because, as you recall, ladies and gentlemen, he did describe the automobile driving away, and so forth.

"Mr. Cochran: And he said the fifth bullet had been fired from his gun and, of course, he was helpless to do anything further.

"Foreman Berry: I think that is entirely satisfactory. We thank you very much.

"The Court: You may now retire."

Appellant urges that instead of complying with the jury's request, the court "offered them a short and unsatisfactory summary of what the testimony was as to 'the ultimate facts on that subject, so far as we could recall them.' " Also, that this procedure was highly erroneous and prejudicial, since this testimony was vital to the determination not only of "the question of innocence or guilt of the defendant, but as to whether the degree of the offense was first or second degree."

Section 1138 of the Penal Code does not define the procedure to be followed upon the return of a jury to the court for information, except to state that "Upon. being brought into court, the information required must be given in the presence of, or after notice to, the district attorney, and the defendant or his counsel, or after they have [been] called." In other words, there is no requirement that testimony should be *read* to the jury.

Apparently appellant consented to the procedure followed herein and also agreed as to the contents of the statement which fairly summarized the testimony relating to the possession and use by appellant of a deadly weapon. In the absence of any objection by appellant at the time, it must be conclusively presumed that the statement made was satisfactory to him and that no prejudice resulted therefrom.

█ It is next contended that the court erred in failing of its own motion to instruct the jury as to the mental condition of appellant at the time when the alleged offenses were committed. In this regard, while he admits that he did not request that such instruction be given, appellant maintains that since the issue of his mental ability was developed by the evidence, an instruction thereon was required to the end that he should be assured a fair trial.

The evidence upon this question included the testimony of the night watchman McFee that appellant looked "very wild"; he thought appellant was under the influence of narcotics because he. believed there was something wrong with him and he thought it was something other than liquor; that the witness "figured that a .45 ought to knock a man down

and if it does not knock him down, there is something wrong with him.''

Appellant testified to certain lapses of memory on the night in question; that he remembered starting to leave the Circle Bar around 1:30 a. m. of May 19th but did not remember anything more until he found himself inside the service station; that a man said to him, ''What are you doing there?'' and he replied, ''Nothing . . . I didn't know what I was doing in there, in the first place.'' That he remembered that the man said ''Come out or I will blow your head off,'' and was pointing a gun at him. Appellant further testified that he followed the man to a certain point and then stopped; that he had a cigarette in his hand and as he ''bent over to drop it down and step on it everything went black,'' that the next thing he remembered he was in his car and ''there was a lot of noise . . . the tire was gone . . . I drove to my hotel . . . I kept passing out and coming to''; that he left his hotel and went out to look for a doctor to dress his wounds and was arrested. He also testified that he started drinking at six o'clock the night before and during the night he drank 20 or 30 straight whiskies with beer chasers; that he did not remember having had a tire iron in his hand while he was at the service station; did not remember that he broke any glass; and did not remember hearing the sound of breaking glass; did not hear any shots fired by Mr. McFee or anyone else, but definitely denied that he had a gun in his hand or otherwise in his possession at any time that evening. With respect to conversations he had with the various police officers after his arrest, he testified either that he did not remember them or positively denied them. He also testified that he was involved in an automobile accident in 1938 and as a result received some head injuries.

An examination of the entire record in this cause discloses that appellant's argument that ''the sum of his testimony in regard to his condition after 'everything went black,' is that he was unconscious and did not know what transpired,'' is without merit. There is nothing in the evidence from which the jury could infer that appellant lost consciousness at any time during the night in question. While on the witness stand he apparently sought to leave such impression with the jury by his answers to the questions propounded, i. e., by stating that he did not remember what he was doing during the latter

portion of the night, and by making many inconsistent and ambiguous statements with regard thereto. However, there was evidence that he was driving an automobile from place to place and that in various conversations with the several police officers after his arrest, he made a full disclosure as to why he went to the service station and what took place while he was there, as well as thereafter. In the circumstances presented, the instruction given to the jury on the question of involuntary intoxication was amply sufficient to protect and safeguard appellant's right to a fair and impartial trial.

At the close of the trial, and immediately preceding arguments of counsel to the jury, the court of its own motion dismissed count 3 of the information, to wit: "Count three is at this time dismissed because it is merely a matter which, if tenable, would be included in what has already previously been charged in count two."

As will be remembered count 2 charged assault with a deadly weapon with intent to commit murder, and count 3 charged assault with a deadly weapon.

It is here contended by appellant that the dismissal of count 3 constituted an acquittal of the charge of assault with a deadly weapon and therefore resulted in an acquittal of assault with a deadly weapon with intent to commit murder of which he was found guilty as charged in count 2; that it necessarily follows that the verdict of guilty of the crime charged in count 2 is void, because assault with a deadly weapon is included in assault with a deadly weapon with intent to commit murder "and an acquittal or conviction of the lesser of these offenses is a bar to further prosecution for the greater offense."

It would appear that the opinion in *People* v. *Horowitz,* 131 Cal.App.Supp. 791 [19 P.2d 874], to which respondent calls attention and which has been cited with approval by the Supreme Court of this state, is determinative of the point here raised by appellant.

In the cited case defendants were first charged with putting on an immoral and indecent show (count I), then with putting on an immoral and indecent scene or part of a show (count II). At the conclusion of the trial by the court without a jury, the defendants . . . were found guilty on the first count; the second count was dismissed. Appellants there contended that if they were not guilty of the charge set forth in the second count, they were not of that contained in the first,

and that as the dismissal operated as an acquittal of the one charge, their conviction of the other cannot stand.

The court stated at page 793 as follows: "If we admit, for the moment only, that the dismissal was an acquittal, and that one not guilty of participating in an indecent part of a show could not be guilty of participating in an indecent show, still it does not follow that the judgments should be reversed. Authorities could be cited which would seem to support a reversal. (*People* v. *Andursky* 1925), 75 Cal.App. 16 [241 P. 591] ; *People* v. *Puppilo* (1929), 100 Cal.App. 559 [280 P. 545].) But we find more persuasive cases recognizing that such inconsistent verdicts may be caused not by the confusion but the mercy of the jury, of which the appellant can neither complain nor gain further advantage. (*People* v. *Stovall* (1928), 94 Cal.App. 635 [271 P. 576] ; *People* v. *Smith* (1931), 117 Cal.App. 530 [4 P.2d 268] ; *State* v. *Jackson* (1926), 121 Kan. 711 [249 P. 688] ; *State* v. *Axley* (1926), 121 Kan. 881 [250 P. 284].) Moreover, probably to avoid the result of those cases which interpret inconsistent verdicts as acts of stupidity rather than acts of leniency, section 954 of the Penal Code was amended in 1927 so that it now reads, in the part here controlling:

" 'An indictment . . . or complaint may charge . . . different statements of the same offense . . . under separate counts. . . . A verdict of acquittal of one or more counts shall not be deemed or held to be an acquittal of any other count.' This last sentence is applied in *People* v. *Ranney* (1932), 123 Cal. App. 403 [11 P.2d 405, 406], where a contention has been made that a conviction on two counts could not stand because of an acquittal on five counts. In part the court said: 'Each count must stand upon its own merit. The amendment to section 954 of the Penal Code conclusively settles this controversy adversely to the contention of appellant.' Nowhere do we find the validity of the amended section questioned; nowhere else do we find that it came to the attention of the court. We conclude that even if the dismissal be regarded as an acquittal, that is no reason why the judgment of conviction, based on ample evidence, should be reversed.

"We are of the opinion, however, that the dismissal was not an acquittal. . . . It is quite evident that, in *People* v. *Clensey, supra,* [97 Cal.App. 71 (274 P. 1018)], the court considered a dismissal something else, and less, than an acquittal. A dismissal connotes a refusal to determine guilt rather

a finding that there is no guilt. Particularly is this true under the circumstances of this case. The trial judge, at the conclusion of the evidence, found the defendants guilty of the offense charged in the first count. It was apparent that the first was so allied to the second that a conviction on the second count would but lead to complications. No sentence could be imposed, for that would result in double punishment. [Citing authorities.] He did not want to find the defendants not guilty, for he was convinced of their guilt. There was but one logical way out: dismiss the superfluous count. This he had a right to do, under section 1385 of the Penal Code, 'in furtherance of justice.' [Citing authorities.]

"We are of the opinion, therefore, that there is no formula, framed to safeguard the rights of those charged with crime, which is offended by the affirmance of these judgments; nor is there statute or case authority justifying a reversal."

On the question of double jeopardy, it was held in the cited case, page 793, as follows: "It may well be that, following a reversal of these judgments, appellants could successfully press the plea of once in jeopardy against a new trial because of the fact that they had gone to trial under the dismissed count. (*People* v. *Ny Sam Chung* (1892), 94 Cal. 304 [29 P. 642, 28 Am.St.Rep. 129].) A plea of once in jeopardy has no place, however, in this case, where the jeopardy referred to took place at the same trial as the conviction sought to be set aside. (*People* v. *Degnen* (1925), 70 Cal.App. 567 [234 P. 129]; *People* v. *Day* (1926), 199 Cal. 78 [248 P. 250]; *People* v. *Clensey* (1929), 97 Cal.App. 71 [274 P. 1018].)" (See, also, *People* v. *Amick*, 20 Cal.2d 247, 252 [125 P.2d 25], quoting from the Horowitz case.)

In *People* v. *Krupa*, 64 Cal.App.2d 592, 604 [149 P.2d 416], analyzing section 1021 of the Penal Code which provides: " 'If the defendant was formerly acquitted on the ground of variance between the indictment or information and the proof, or the indictment or information was *dismissed* upon an objection to its form or substance, or *in order to hold the defendant for higher offense, without a judgment of acquittal, it is not an acquittal of the same offense.* '" The court stated: "The above section recognizes a right in the court to dismiss a charge in order to hold the defendant for a higher offense. It is not provided that the dismissal must be made before plea. It has been held that a dismissal made to hold for a higher offense after a jury has been impaneled and sworn, that is, after jeopardy has attached, will bar a *subsequent* prosecution for

a higher offense in which the dismissed charge is included. (*People* v. *Ny Sam Chung,* 94 Cal. 304 [28 P. 642, 28 Am.St. Rep. 29] ; *People* v. *Hunckeler,* 48 Cal. 331; 7 Cal.Jur. 944, 949, 953; see, also, *People* v. *Horowitz,* 131 Cal.App.Supp. 791 [19 P.2d 874].)'' (Italics added.)

Applying the reasoning of the Horowitz case to the facts presented by the instant cause, the dismissal of count 3 did not constitute an acquittal, and was not a bar to a conviction of the greater offense where the jeopardy ''took place at the same trial as the conviction sought to be set aside.''

For the reasons stated, the judgment and order appealed from are, and each of them is, affirmed.

Doran, J., and White, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied November 8, 1945. Carter, J., did not participate therein.