[Crim. No. 1016.    Fourth Dist.    Mar. 18, 1955.]

THE PEOPLE, Respondent, v. ANTHONY PICARONI
et al., Appellants.

Anthony Picaroni, in pro. per., and Merideth L. Campbell for Appellants.

Edmund G. Brown, Attorney General, and Doris H. Maier, Deputy Attorney General, for Respondent.

GRIFFIN, J.—Defendants were jointly convicted of burglary by a jury on count one of an information and acquitted on another count. Defendant Picaroni admitted two and Chacon five prior felony convictions.

The evidence shows that the McKains, prosecution witnesses, resided at 2414 Chatsworth Boulevard, in San Diego. Their garage was a building separated from their residence. When they left their premises at about 8 p. m. on May 16, 1954, the garage door was left open, but they believed their home was locked. About 40 minutes thereafter they returned and found a blue truck backed up in their driveway and two men, wearing Navy T-shirts, with no hats, were seen loading boxes and crates on the truck. The lights were not burning in the garage nor on the truck, but a street light shone upon them. Mr. McKain walked up the driveway and believed the men were there servicing the soft-water tank. Defendant Picaroni, identified by McKain, came out of the garage and nonchalantly walked down the driveway past him and said: ''Howdy.'' McKain asked what was going on and another man, claimed to be Chacon, came out of the garage and they both jumped in the truck and drove away at a high rate of speed with the lights turned off. Although McKain did not see Chacon's face,

he noticed his general build and that he was wearing a T-shirt and no hat.

An inventory was taken of the house and garage. Two crates of dishes were missing from the garage. Jewelry, sterling silver, and electric kitchen utensils were missing from the house. The automatic washer had been disconnected from the wall in the garage. Within 2 miles of the McKain home, defendants Picaroni and Chacon were stopped by a police officer for speeding in a blue pickup truck. Picaroni was bareheaded, wore a white T-shirt and khaki trousers. Chacon was similarly dressed but wore Levis. The officer checked the registration certificate of the truck and it belonged to Picaroni. He noticed some articles in the rear of the truck consisting of wooden crates, paper bags, etc. Picaroni said they were his and that he had been moving that day and was tired and was going to finish moving the next day. Defendant Chacon, identified by the officers, said he had been helping Picaroni because he had a family to support. The officers took the number of the truck and gave them a citation. The burglary was reported, and the following morning, at about 6 o'clock, the officers went to the home of Picaroni, where the blue truck was identified by the McKains. On it were found two boxes of Mrs. McKain's jewelry. Defendant Picaroni was awakened and asked about the burglary. He denied participation in it and explained his possession of the jewelry by saying that he had purchased it in Tijuana the previous evening while he was with one Shotwell, to whom he had previously loaned the truck. A box of silverware was recovered from the defendant Chacon's locker at his place of employment. Many of the articles taken were delivered by Chacon to the home of Mrs. Worrell, who testified Chacon said he wanted them stored there for a friend of his who was separated from her husband.

Plaster casts of footprints made on the McKain driveway were identified as those of Chacon and Picaroni. At the police station on May 17th, Picaroni stated he left home in his truck about 4 p. m. on May 16th and went to the Beach Comber's Café at Mission Beach, had a few drinks and met one Shotwell there; that Shotwell borrowed his truck and returned in 45 minutes with his girl friend and the three drove to Tijuana; that he left them and purchased a purse, and when he returned to the truck Shotwell showed him some jewelry and sold it to him for $11, and that this was the jewelry the officers found in his truck the next morning. He did not mention that Chacon was with them during this time or on this trip.

On the same day Chacon was picked up. He said that on May 16th he and Picaroni met at about 1:30 p. m. and were together for a while; that they agreed to go to Tijuana that evening at about 10 p. m.; that they so met, picked up Chacon's wife, and drove to Tijuana; that Picaroni purchased a lady's purse and Chacon purchased a set of earrings; that they subsequently parted; and that he did not see Picaroni again.

On May 18th, Picaroni was informed of Chacon's arrest and he materially changed his story. He then stated that he drove to Chacon's home on the afternoon of May 16th to return some fishing gear; that later they drove to Mission Beach and he let Chacon out at the amusement center; that he went on to the Beach Comber's Café and there met Shotwell; that Chacon later went there and told him he was leaving to meet his wife; that Shotwell borrowed the truck to move his girl friend's furnishings, and gave him the name and address where his girl friend lived; that he wrote it down in a note book; that after one hour he became concerned about his truck and decided to go to the address indicated in the note book; that he hitch-hiked a ride to the address and when he arrived there he saw his truck backed up in the driveway; that Chacon and Shotwell were there and just then the McKains returned home; that he and Chacon tried to "right" the washing machine in the garage and intended to remove the articles from the truck and replace them in the garage, but became frightened; that he greeted McKain, and Shotwell ran across the lot; that he and Chacon left in the truck with the lights on and were stopped by the officers as indicated by them; that they drove to Chacon's home, unloaded the articles, and then left with Chacon's wife for Tijuana to look for Shotwell; that the wife inquired about the jewelry that she saw on the seat of the truck and Picaroni stated it was his and he put it in his pocket. He then admitted that his previous story about purchasing it in Tijuana was false. He claimed they hid the wooden crates of dishes and the electric equipment until they could find out from Shotwell what had happened. He stated that Shotwell usually went to a certain bar in Tijuana and that he was well known to the owner of the Beach Comber's Café. On May 18th, Chacon informed the officers as to the whereabouts of the property and his attorney assisted them in recovering it. Efforts were made by the police officers to check on Shotwell, but neither the bartender nor the owner of the Beach Comber's Café knew him nor remembered his being present at the time indicated by defendants. The other

persons interviewed by them had not seen Shotwell since 1953.

It appears that on July 12, 1954, an investigator in the district attorney's office visited Chacon in the jail, at his request. Chacon asked him: "If I 'cop out' on this, can I be sent back to Folsom as a parole violator? . . . I have a good case. They have nothing on me. The people couldn't identify me there." To this question the investigator replied: "Well, if you have a good case, why do you wish to plead guilty to this charge here?" Chacon replied that he was afraid that Judge Hewicker would send him up for life on two other cases, and mentioned that this was his "third time." When asked about his association with "this man" he said the "other fellow" had come to his house and brought Chacon back to the "other fellow's" house where they visited and then went to get some drinks; that on the way back the "other fellow" stopped the truck and went "back in the back," and the "other fellow" brought the stuff out and Chacon loaded it on, but "the people that were there, they came and they saw both of us, but they refused to identify me." Chacon at that time did not mention Shotwell or anyone else by name, but referred to him only as the "other fellow."

Defendant Chacon's wife testified at the trial that she, Picaroni and Chacon went to Tijuana that night in the truck; that she saw the jewelry and that Picaroni told her it belonged to a friend of his and he was trying to sell it for him; that Chacon told her the articles stored in the shed belonged to Picaroni and that they were storing them for him because he did not have any place to put them.

At the trial Chacon did not take the stand to testify. Picaroni was represented by separate counsel. His testimony was quite similar to the last story told the officers, with some embellishments. He stated that when he arrived at the McKain garage Chacon told him: "This Shotwell is going crazy. I don't know what he is doing"; that Chacon told him that while he was waiting for a bus at the amusement center, Shotwell came along with Picaroni's truck and asked him to help him move and he did so thinking that Shotwell was telling the truth, but he felt there was something wrong about the story so, after Shotwell ran, he and Picaroni started unloading the truck and picking up the parts of the washing machine when McKain walked up on them; that he did not mention Chacon in the first conversation with the officers because he did not want to involve him. Defendant Picaroni did produce a witness who testified he picked "Toni" Pica-

roni up at the point indicated and drove him to the address stated on Chatsworth Boulevard the night of May 16th. The bartender and owner of the Beach Comber's Café both testified that Picaroni introduced Chacon to them on May 16th; that they did not know Shotwell; that he was never introduced to them that day; and to their knowledge he had never been in the café.

On this appeal by defendant Picaroni, in propria persona, he raises the claim of double jeopardy, in that the two counts of the information charged but one burglary, growing out of the same transaction and act; that an acquittal on one count is a bar to a conviction on the other, and in violation of his constitutional rights, citing such authorities as *People* v. *Stephens,* 79 Cal. 428 [21 P. 856, 4 L.R.A. 845]; *Sutton* v. *United States,* 157 F.2d 661; *State* v. *Smith,* 43 Vt. 324; *Wilson* v. *State,* 24 Conn. 57; *People* v. *Nor Woods,* 37 Cal.2d 584, 586 [233 P.2d 897]; *People* v. *Hight,* 94 Cal.App.2d 100 [210 P.2d 270]; and *People* v. *Stickman,* 34 Cal. 242.

From the amended information it appears that defendants were jointly charged in count one that on May 16, they entered the ''home and building owned and occupied by the McKains at 2414 Chatsworth Boulevard''; and in the second count, that they did, on the same day ''enter a building, to wit: a garage, owned and occupied'' by the McKains, at the same address, ''with intent then and therein, . . . to commit theft.''

From the evidence it appears that the garage was a separate building from the dwelling house and that a cement walk led from one to the other. The distance they were apart is not clear from the testimony. Some of the articles stolen were taken from the garage and some from the dwelling. Upon what theory the jury found ''defendants not guilty of entering the dwelling'' but guilty of entering the garage, is not indicated. It clearly appears that defendants did enter and were found in the garage, and were endeavoring to and did remove certain personal property from it, and accordingly would properly be found guilty of burglary in the second degree if the jury believed the evidence produced by the prosecution. It may be that the jury felt that there was one Shotwell implicated in the burglary; that he was the one who entered the residence and took the remaining property and jewelry without the knowledge of these two defendants; and that these defendants did not aid and abet him in so doing. This may account for a ''not guilty'' verdict of first degree

burglary on the first count. It did return a verdict of guilty of second degree burglary on the second count, and the evidence fully supports the verdict.

▇ Section 459 of the Penal Code provides that "Every person who enters any house, room, . . . shop, . . . barn, stable, outhouse or other building, . . . with intent to commit grand or petit larceny or any felony is guilty of burglary." It is clear from this section that the entering of the garage or the house, under the circumstances related, would be burglary. ▇ Section 460 of the Penal Code defines the degrees of burglary. Entering an inhabited dwelling house or building in the nighttime would be burglary of the first degree, and the entry of an uninhabited garage would be burglary of the second degree. Accordingly, the entry of the garage alone would not necessarily be an entry of the inhabited dwelling. (*People* v. *Olivar*, 40 Cal.App.2d 48 [104 P.2d 382] ; *People* v. *Russell*, 34 Cal.App.2d 665 [94 P.2d 400] ; *People* v. *Stickman*, 34 Cal. 242; *People* v. *Patterson*, 82 Cal.App. 96 [255 P. 209].) ▇ In addition to the definition of the offense and the degrees of burglary indicated, the jury was furnished with verdicts as to each count. The degree fixed in the first count was specified as first degree, and in the second count as second degree, and the jury was specifically told to "note that the first count of the amended information applies to the McKain dwelling. The second count applies to the garage." Accordingly, it cannot be successfully maintained that the issues presented were inconsistent, confusing to the jury, or to the defendants, or that an acquittal on count one constituted an acquittal as to count two. The same question was fully considered by us and affirmed in *People* v. *Amick*, 20 Cal.2d 247 [125 P.2d 25]. It was there held that under Penal Code, section 954, providing that a verdict of acquittal of one or more counts shall not be deemed an acquittal of any other count, a verdict of not guilty upon a count charging manslaughter and of guilty upon a charge of negligent homicide is not inconsistent, although both charges grew out of the same act which resulted in the death of the same individuals. The two crimes are not identical. Under the code section each count which charges a separate and distinct offense must stand upon its own merits, and the disposition of one count has no effect or bearing upon the verdict with respect to the others. (See also *People* v. *Dreyer*, 71 Cal.App.2d 181 [162 P.2d 468].)

▇ The claim that no corpus delicti was established is

without merit as well as the statement that the garage contained walls only on three sides and was therefore not a structure or building coming within the provisions of section 459 of the Penal Code. The garage was possessed of a door on the fourth wall which, although open at the time, sufficiently classified the garage as a building susceptible of burglary. (*People* v. *Miller,* 95 Cal.App.2d 631 [213 P.2d 534]; *People* v. *Buyle,* 22 Cal.App.2d 143, 149 [70 P.2d 955].) Contrary to the claims of Picaroni, no constitutional rights of his appear to have been violated. He was sufficiently informed of the charges against him. The court, district attorney, and defendant Chacon's counsel were not guilty of any prejudicial misconduct, and he had a fair trial. There is no showing that his conviction was founded on perjured testimony or that he was inadequately represented by his counsel.

In the brief of defendant Chacon it is claimed that the prosecution willfully introduced evidence against him of his prior convictions after he had admitted those convictions, as pleaded, prior to the trial, citing *People* v. *Jones,* 31 Cal. 565; *People* v. *Hartman,* 62 Cal. 562; and section 1025, Penal Code. He did not take the stand to testify. The claimed conversation above mentioned which took place in the county jail was between this defendant and the investigator of the district attorney's office. The portion of it, received in evidence over objection, related to the statement: "If I 'cop out' on this, can I be sent back to Folsom as a parole violator?" and where he mentioned that this was his "third time." It appears that only the first part of this conversation was offered by the prosecution and the latter portion was not offered for the reason that the prosecution believed it might be prejudicial error to receive it. The trial court apparently, not knowing the contents of the conversation, overruled defendant's objection as to its admissibility, and then the investigator related the latter portion in reference to the "third time." No motion to strike any portion of the conversation was made. On a motion for a new trial the trial judge sensed the possible error of its reception and fully considered it.

The evidence shows that Chacon's counsel, when interviewing the prospective jurors on *voir dire,* asked: If "it was shown in this case that Chacon was guilty of a prior felony and served time in a penal institution, would that prejudice you in this matter to a degree that you would disregard the evidence . . . that you would try him today

on the crime charged here—burglary, on what he did, and not what he did five or ten years ago?'' It further appears that his attorney brought up this subject on cross-examination of one of the officers, wherein he asked him if he did not receive an anonymous telephone call from the ''parole officer of Mr. Chacon.'' The court concluded, in view of the overwhelming evidence of Chacon's guilt of the offense charged, and in view of the first introduction of the subject matter by Chacon's attorney, that no prejudicial error resulted. We are in accord with this conclusion. (*People* v. *Wilkison*, 30 Cal. App. 473 [158 P. 1067]; *People* v. *Tibbitts*, 35 Cal.App.2d 669 [96 P.2d 812]; *People* v. *Gomez*, 41 Cal.2d 150, 163 [258 P.2d 825]; Cal. Const. art. VI, § 4½.

█ The last claim is that it was unethical for an investigator of the district attorney's office to interview defendant Chacon in jail after he knew that defendant had counsel representing him and failed to notify such counsel of this interview. This is an action against defendant Chacon for burglary and not one against an investigator of the district attorney's office for unethical conduct. It was this defendant who, knowing he was represented by his own counsel, requested the district attorney to come to see him about something. It may have been about better sleeping quarters or the menu, as far as the district attorney was concerned. At any rate, it appears that defendant Chacon was anxious to present some deal to the district attorney, in the absence of his counsel, whereby he might receive a lesser sentence by a plea of guilty. There is no evidence of any such agreement by the officer or district attorney. There is no contention that any claimed confession of guilt was obtained by virtue of anything that this investigator said to the defendant, and no bad faith on the part of the prosecutor is indicated. No prejudicial error resulted.

Judgment and order denying a new trial affirmed.

Barnard, P. J., and Mussell, J., concurred.