[Crim. No. 13986. Fourth Dist., Div. One. Nov. 12, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
JERALD ABBOT ADAMS, Defendant and Appellant.

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and David Y. Stanley, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Robert D. Marshall and Garrett Beaumont, Deputy Attorney Generals, for Plaintiff and Respondent.

OPINION

**STANIFORTH, J.**—Defendant Jerald Abbot Adams was charged with assault with intent to commit murder (Pen. Code, § 217) and discharge of a firearm at an occupied building (Pen. Code, § 246). After opening statements at the commencement of the original trial, the court granted Adams' motion for mistrial on the ground the district attorney had not previously given Adams' counsel discovery of tapes and other evidence pertaining to the hypnosis of a key prosecution witness on the issue of identification. Upon the second trial, defense counsel moved to exclude testimony of victim-witness Phyllis Taylor on the ground her memory of the incident had been affected by hypnosis before the first photographic lineup and the live lineup. Counsel also argued the photographic lineup shown to Taylor was unfair and unduly suggestive. The trial court denied these motions as well as a defense motion to exclude testimony concerning a sawed off .22 caliber rifle found in a car in which Adams was a passenger. The jury found Adams guilty of assault with a deadly weapon (a lesser included offense of the charge of assault with intent to commit murder) and of discharging a firearm at an inhabited dwelling. Adams was sentenced to prison for four years, the upper term for assault with a deadly weapon and to a concurrent four-year term for discharging a firearm at an occupied dwelling.

FACTS

On Saturday afternoon, May 18, 1980, Phyllis Taylor was washing her car in her front yard. Adams and a companion drove by in a white Ranchero automobile and stopped at the curb. Adams and the driver yelled racial epithets at Mrs. Taylor. This racially abusive yelling went on for about five minutes. Mrs. Taylor responded and threatened to call the police. Finally, when Mr. Taylor came out of the house, these malevolent cowards drove away, shouting they would return. A few minutes later they did return and shot a .22 rifle at the

Taylors who were standing in the driveway. Mrs. Taylor ducked behind her car before the shot was fired. The cravens again sped off but returned in about five minutes. Mrs. Taylor was inside the house. Adams fired a shot into the garage. The first bullet lodged in the hallway outside the house and the second bullet hit Mr. Taylor's motorcycle and lodged in a clothes hamper.

Mrs. Taylor and neighbors accurately described the car. A California license number was relayed to the police. A Ranchero matching this description was stopped three days after the shooting. Adams was again riding in the passenger seat. As the result of a consensual search, a sawed-off .22 caliber rifle was found immediately under Adams' seat. Evidence of this find was admitted over Adams' objection (Evid. Code, § 352). The spent bullets found in the Taylor house could have been fired from this rifle. Mrs. Taylor identified Adams in two photo lineups, in a live lineup and made positive identifications at both the preliminary hearing and the trial. Mr. Taylor also identified Adams.

Four days before the first photographic lineup (June 6, 1980), Mrs. Taylor was hypnotized at police request to enhance her recollection of the shooting incident. As noted Adams objected to Mrs. Taylor being allowed to testify because she had been hypnotized. The court overruled the objection and permitted her to testify.[1]

Adams' defense was that his twin brother John was the assailant. John testified he fired the shots and left the rifle under the car seat. At the time John testified he was awaiting trial for murder and other high profile felonies. He had been convicted of a burglary charge; that judgment was on appeal.

## DISCUSSION

### I

■ The California Supreme Court in *People* v. *Shirley* (1982) 31 Cal.3d 18 [181 Cal.Rptr. 243, 641 P.2d 775], held it was reversible error to admit testimony of a complaining witness who had undergone hypnosis to restore her memory of the events at issue. The Supreme Court first held the rule applied to all cases not yet final as of the date of the *Shirley* decision. However, a

---

[1]The Attorney General argues the issue is not cognizable as it was not raised before the trial court. This assertion is not true. Counsel in arguing against admissibility said "the present testimony is inadmissible as long as it's based on hypnosis session." Counsel commented: "Your Honor, the simple fact of hypnosis without suggestibility does not taint what occurs thereafter." The rationale underlying the general rule that an issue not raised at trial cannot be raised on appeal for the first time is that the factual situation may not have been fully litigated in the trial court. (See *In re Joe R.* (1980) 27 Cal.3d 496, 510 [165 Cal.Rptr. 837, 612 P.2d 927].) Here defense counsel requested an in-camera hearing on the admissibility of testimony from a purposely hypnotized witness and the court made an evidentiary ruling on the very issue now raised here.

modification, 31 Cal.3d 918a, 918c, stated: "The principles stated in this opinion will govern the admissibility of the testimony of any witness who submits to pretrial hypnosis after the date of this decision. We take no position at this time as to the application of those principles to witnesses hypnotized before the date of this decision." The *Shirley* decision is dated March 11, 1982, Adams' trial was conducted in November 1980, the verdicts were rendered on November 7, 1980. Thus by its express terms *Shirley* "takes no position" as to the application of its principles to the case at bench. Following *Shirley, People v. Williams* (1982) 132 Cal.App.3d 920 [183 Cal.Rptr. 498] (hg. den. Sept. 15, 1982) affirmed a conviction although based upon the testimony of a witness who had undergone hypnosis and in so doing held the *Shirley* decision should be given only prospective effect.

The Supreme Court stated: "[T]he hypnotic process does more than permit the witness to retrieve real but repressed memories; it actively contributes to the formation of pseudomemories, to the witness' abiding belief in their veracity, and to the inability of the witness (or anyone else) to distinguish between the two." (*Shirley, supra,* 31 Cal.3d 18, at p. 53.)

Two legal principles underlie this concern over the effect of hypnosis: (1) posthypnosis testimony is unreliable evidence and (2) the hypnosis process may infringe on a defendant's right to effective cross-examination. Testimony after hypnosis may be unreliable because the witness may testify to "pseudomemories" with perfect belief in their veracity. Pseudomemories or confabulation may occur even when the hypnosis process itself was not suggestive, but the risk of the unreliable evidence contaminating a fair trial is higher when it is argued the testimony was the product of hypnotic suggestion. More importantly, no one, not judge, venireman, or expert hypnotist, is able to distinguish between prehypnosis memories and posthypnosis pseudomemories if the witness cannot make this distinction. No defense lawyer could cross-examine the witness to reveal pseudomemories regardless of whether this additional posthypnosis recall was "real," "confabulated," or "suggested."

The first principle, posthypnosis testimony is generally unreliable, is a judicial determination as a matter of law the evidence is not entitled to any weight. (*Shirley, supra,* 31 Cal.3d at p. 33 et seq.) Given a certain set of facts, posthypnotic suggestion could have a profound and disruptive effect in a particular case. However, no such case was made out factually here. At a hearing, on the admissibility of Mrs. Taylor's testimony, the court examined a tape of the entire hypnosis session and determined there was no evidence Mrs. Taylor's testimony was in any fashion based upon hypnotic suggestion. The trial court was satisfied Mrs.Taylor's identification in the photographic lineup processes, the live lineup processes and the open court identification was unaffected by the hypnosis. We are bound to give great weight to this finding. (*Peo-*

ple v. *Lawler* (1973) 9 Cal.3d 156 [107 Cal.Rptr. 13, 507 P.2d 621].) Mrs. Taylor's constant identification of Adams is buttressed by the testimony of her husband who, although unable to make positive identification at the photographic lineup sessions, did identify Adams at both the preliminary hearing and upon trial. Further, this defendant was found in, at minimum, constructive possession of the rifle used in the shooting.

Mrs. Taylor's identification is not minified by the testimony of twin brother John who seeks to take the blame for these despicable deeds. His testimony identifies the car and the gun without question, thus confirming the Taylors' and the neighbors' observations. The fact context in which John seeks to take the blame raises a strong suspicion he was trying to relieve his brother from a possible prison sentence without himself having anything to lose.

The second principle protected by *Shirley* is the defendant's right to effective cross-examination. However, *Shirley* did not go so far as to say hypnosis per se precluded effective cross-examination in all pre-*Shirley* cases, and Adams makes no showing hypnosis affected his ability to cross-examine Mrs. Taylor.[2] (See *State* ex rel. *Collins* v. *Superior Court, etc.* (1982) 132 Ariz. 180 [644 P.2d 1266, 1295] [*Collins II*].)

We can find no fact basis here compelling application of the *Shirley* principles to this case. In *Shirley* the prosecution contaminated the testimony of the sole witness "by subjecting her to a hypnotic experience on the eve of trial for the purpose of 'filling the gaps' in her story." (31 Cal.3d, *supra*, at p. 23.) The victim's testimony in *Shirley* was "vague, changeable, self-contradictory [and] prone to unexplained lapses of memory." (*Ibid.*) No contamination is shown in this case. Mrs. Taylor never waivered in her identification of Adams, her statements prehypnosis are consistent with her posthypnosis testimony. Adams does not direct us to any testimony produced by hypnotic suggestion nor did the trial court discover any improper influence when it reviewed the tape.

## II

■ A charge is also made Adams' in-court identification by Mrs. Taylor was tainted by suggestive photographic lineups. Adams complained the first lineup (June 10) did not contain a photograph of his twin, although one was

---

[2]Adams does not argue nor do the facts support a conclusion his conviction rests on a violation of his due process right to a fair trial. The United States Supreme Court stated: "Insofar as the accused's conviction may rest on a courtroom identification in fact the fruit of a suspect pretrial identification which the accused is helpless to subject to effective scrutiny at trial, the accused is deprived of that right of cross-examination which is an essential safeguard to his right to confront the witnesses against him. *Pointer* v. *Texas*, 380 U.S. 400 [85 S.Ct. 1065, 13 L.Ed.2d 925]. And even though cross-examination is a precious safeguard to a fair trial, it cannot be viewed as an absolute assurance of accuracy and reliability." (*United States* v. *Wade* (1967) 388 U.S. 218, 235 [18 L.Ed.2d 1149, 1162, 87 S.Ct. 1926].)

available in the sheriff's department archives, and Adams' photograph was about three years old. The officers explained they did not use a newer photograph because it would not have shown his beard as did the older photograph. Mrs. Taylor told the police the shooter had a scraggly beard. Furthermore, Adams complains the photograph used in the lineup included a bandage on his forehead. In order to alleviate any suggestiveness by the bandage on Adams' forehead all of the photographs used were presented with a piece of paper across the forehead.

In *People* v. *Caruso* (1968) 68 Cal.2d 183 [65 Cal.Rptr. 336, 436 P.2d 336], two robbery victims noted the large size and dark complexion of the robbery car driver. In a lineup the defendant was much larger and darker than the other subjects. He was identified by both victims. The Supreme Court found the lineup was unnecessarily suggestive, conducive to irreparable mistaken identification, grossly unfair and deprived the defendant of due process of law. (*Id.*, at pp. 187-188.)

In *People* v. *Slutts* (1968) 259 Cal.App.2d 886 [66 Cal.Rptr. 862], two child witnesses observed a man with a beard on two occasions. One of the witnesses observed him engage in sexual misconduct. A few days later the police showed one of the witnesses a photographic lineup of clean shaven men, the witness selected the photograph of defendant as most closely resembling the suspect. The officer then drew a beard on that picture. Later the second witness was shown the same lineup with the beard still drawn on the defendant's picture which the witness pointed out as most like the suspect. The procedure was found to be unfair as to the identification by the second witness.

We have independently examined this photographic lineup. It shows that all the participants had different types of facial hair, some with mustaches, some with beards, goatees, etc. Nothing sets the picture of this defendant off by his facial hair. Moreover, each of these pictures has the forehead covered. How it can be said that in some fashion this uniform covering is suggestive cannot be determined. *No* suggestion leads to the defendant by reason of the facial hair or the bandage on his forehead.

Furthermore, an examination of the photograph of the physical lineup results in our independent conclusion it was a most fair nonsuggestive lineup. That Mrs. Taylor was able to pick out this defendant from the number of young men similarly dressed and with such similar facial appearances points to the accuracy and soundness of her memory. The detail of her testimony and her precision on the stand also lends strength to the conclusion her eyewitness iden-

tification in court was not the result of some tainted pretrial photographic lineup process.

## III

The trial court instructed the jury about assault with a deadly weapon as a lesser included offense of assault with intent to commit murder. No instructions of any other lesser included offenses were given. The prosecutor's proposed list of instructions of lesser included offenses included the crimes of attempted voluntary manslaughter, exhibiting a firearm in a threatening manner and simple assault. These instructions were lined out by a handwritten notation apparently made by the judge, indicating defense counsel disclaimed or waived the stricken instruction. The error, if any, was invited by defense counsel.

■ If we examine the merits of this contention, we conclude there is no duty to instruct a jury on a lesser included offense unless the charged offense as defined by the statute could not be committed without also committing the lesser included offense or if it is within the offense specifically and factually charged in the accusatory pleading. (*People* v. *Orr* (1974) 43 Cal.App.3d 666, 693 [117 Cal.Rptr. 738].) ■ Assault with a deadly weapon or intent to commit murder (Pen. Code, § 217) could be committed without committing attempted voluntary manslaughter or exhibiting a firearm in a rude or threatening manner. The pleadings do not specifically or factually include either of these lesser charges. In this context there was no *sua sponte* duty to instruct the jury on attempted voluntary manslaughter or exhibiting a firearm.

## IV

■ Adams next contends his conviction for discharging a firearm at an occupied building must be reversed because "shooting into Taylor's garage was not shooting into an inhabited dwelling house" within the meaning of Penal Code section 246. This argument is without merit. Section 246 by its express language does not limit itself to an inhabited dwelling house, but rather includes any "occupied building." The term "building" is a generic term meaning any edifice or structure built by man. (*People* v. *Chase* (1931) 117 Cal.App. Supp. 775, 778 [1 P.2d 60].) A "building" is "A structure . . . inclosing a space within its walls . . . ." (Black's Law Dict. (4th ed. 1968) p. 244.) The term "building" would include such structures as outhouses, barns, garages, and an occupied building includes areas controlled by the occupants, such as a garage. (*People* v. *Atwood* (1963) 223 Cal.App.2d 316, 323 [35 Cal.Rptr. 831].) The term "inhabited dwelling" or "house," in section 246 has the same meaning as it has in the section defining first degree burglary. (*People* v. *Chavira* (1970) 3

Cal.App.3d 988, 992 [83 Cal.Rptr. 851].) An attached garage may be an occupied building, thus susceptible to burglary. (*People* v. *Picaroni* (1955) 131 Cal.App.2d 612 [281 P.2d 45]; *In re Christopher J.* (1980) 102 Cal.App.3d 76, 78 [162 Cal.Rptr. 147].)

## V

Adams next argues the trial court erred in admitting evidence of the auto stop and seizure of a sawed-off .22 caliber rifle found immediately beneath Adams under the passenger seat. The gun was found as a result of a consensual search of the car. The sawed-off rifle is, according to Adams' own witness, the gun used in the shooting incident. The mere fact that Adams was present, seated immediately above the rifle does not preclude but rather requires its admission into evidence. His presence literally on top of the gun supports an inference in the mind of a rational juror that this gun belonged to him. This natural, reasonable and highly inculpatory inference cannot be avoided. The fact is relevant and probative on a critical issue in this case. No Evidence Code section 352 error was committed.

## VI

Finally, Adams argues the trial court erred in imposing concurrent sentences. Penal Code section 654 precludes multiple punishments for a single act or indivisible course of conduct. (*People* v. *Miller* (1977) 18 Cal.3d 873, 885 [135 Cal.Rptr. 654, 558 P.2d 552].) Whether a course of conduct 'fits within the 654 proscription depends upon the intent and objectives of the actor; if all the acts are incident to one criminal objective, the defendant may not be separately punished for each act. (*People* v. *Bauer* (1969) 1 Cal.3d 368, 376 [82 Cal.Rptr. 357, 461 P.2d 637, 37 A.L.R.3d 1398], cert. den. 400 U.S. 927 [27 L.Ed.2d 187, 91 S.Ct. 190].) The defendant's intent and objective are factual questions for the trial court; there must be evidence to support a finding the defendant formed a separate intent and objective for each offense for which he was sentenced. (*People* v. *Laster* (1971) 18 Cal.App.3d 381, 394 [96 Cal.Rptr. 108].)

Mrs. Taylor testified the defendant fired a shot at her (Pen. Code, § 217), she ducked behind her car door and then went into the house to call the police. While she was inside she heard another shot. Mr. Taylor testified five minutes passed between the time the car sped away after the first shot and its return when the second shot was fired into the garage. (Pen. Code, § 246.) Mrs. Taylor was in the house and Mr. Taylor was across the street when the second

shot was fired. This evidence supports the trial court's conclusion defendant formed a separate intent and objective for each shot.

Judgment affirmed.

Cologne, Acting P. J., and Wiener, J., concurred.

A petition for a rehearing was denied December 6, 1982, and appellant's petition for a hearing by the Supreme Court was denied January 19, 1983.