Filed 3/19/13  P. v. Linderman CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

THE PEOPLE,

    Plaintiff and Respondent,

v.

MATTHEW LINDERMAN,

    Defendant and Appellant.

E053371

(Super.Ct.No. FVI701945)

OPINION

APPEAL from the Superior Court of San Bernardino County.  Jules E. Fleuret, Judge.  Affirmed in part; reversed in part with directions.

Law Offices of Mark J. Werksman, Mark J. Werksman and Kelly C. Quinn for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steven T. Oetting, and Tami Falkenstein Hennick, Deputy Attorneys General, for Plaintiff and Respondent.

# I

## INTRODUCTION

While carrying out his law enforcement duties as a San Bernardino County Sheriff's deputy, defendant Matthew Linderman preyed on numerous vulnerable women by exhorting sexual favors in exchange for prosecutorial leniency. Defendant appeals from judgment entered following jury convictions for sexual battery by restraint (Pen. Code, § 243.4, subd. (a)[1]; count 2); 11 counts of soliciting a bribe (§ 68, subd. (a); counts 3, 4, 5, 7, 9, 11, 13, 15, 17, 19, 24); two counts of solicitation to engage in lewd conduct (§ 647, subd. (a); counts 6, 18); and oral copulation under color of authority (§ 288a, subd. (k); count 8).[2] The trial court sentenced defendant to a 20-year prison term.

Defendant contends the trial court erred in denying his motion to quash a search warrant, and abused its discretion in excluding drug expert testimony and Internet postings and photographs. Defendant also argues there was insufficient evidence to support his convictions as to counts 6, 8, and 18, and as to the 11 counts of soliciting a bribe. Defendant further argues the prosecutor committed prosecutorial error and the trial court improperly sentenced defendant.

We reject defendants' contentions and we therefore affirm the judgment, except for defendant's conviction as to count 18, which is reversed on the ground it is barred by the statute of limitations.

---

[1] Unless otherwise noted, all statutory references are to the Penal Code.

[2] Count 1 resulted in a hung jury and the jury found defendant not guilty as to the remainder of the counts.

FACTS

**Christina (Counts 1, 2, and 3)**

On July 30, 2007, a Mervyn's security officer apprehended Christina for shoplifting. The security officer took Christina to the mall security office, where she remained until law enforcement arrived. Defendant, who was a San Bernardino County Sheriff's deputy, responded to a call for law enforcement. Defendant told Christina she was going to jail, handcuffed her, and placed her in his patrol car. Defendant permitted Christina to call her friend, Vanessa, to ask her to post bail. Defendant then drove Christina to the police station.

While at the station, Christina was upset about being arrested and told defendant she was concerned her arrest would affect her future prospects of becoming a teacher. Defendant told Christina she was being charged with a felony and could not go home. Defendant offered to reduce her charge to a misdemeanor and release her if she did him "a favor." Christina agreed because she did not want to go to jail. Defendant drove Christina to a secluded area of the shopping mall and asked her if she had seen "Girls Gone Wild," which consists of a series of videos of women exposing themselves and committing sexual acts. Christina said she had not. Defendant responded, "So are you gonna do me that favor?" When Christina said, "What favor?," defendant looked at her and she became very scared. Christina feared something bad was going to happen to her.

Defendant drove Christina to another location at the mall and led her through the mall, handcuffed, to an empty room, that said "Sheriff" on the door. Defendant removed

3

Christina's handcuffs. As defendant was writing up the citation, Christina asked defendant if he was citing her for a misdemeanor or a felony. Defendant again asked Christina, "So what are you gonna do?" Christina said she did not know. Defendant put a camera on the desk and told Christina to remove her shirt and bra. Christina complied out of fear he would hurt her. Defendant was armed with a gun. Defendant said, "Those are nice," picked up his camera, and said "I'm gonna take pictures of you." Defendant told Christina to pose for him while he photographed her chest. He then put his mouth on her breasts and said, "they tasted good" and his penis was "hard." Defendant asked Christina what she "was going to do about it." Christina said, "I don't know."

Defendant told her to put her clothes back on, handcuffed her, and walked her out to the patrol car. After they both got in the car, defendant asked Christina, "How do I know that you're not going to tell on me?" Christina promised not to tell anyone. While driving Christina back to the jail, defendant asked Christina to pull up her shirt. She complied because she was afraid. Defendant also asked Christina to call him later and gave her his number. At the jail, Christina did not report what defendant had done because she was scared. Christina was booked and released by a different officer. A few days later, Christina told her husband what defendant had done. Christina's husband reported the incident to the police.

**Sheila and Cassie (Counts 4, 5, and 6)**

On April 18, 2007, Sheila, Cassie, and Cassie's sister, Yvette, went to a shopping mall. Sheila and Cassie shoplifted items from a Target store while Yvette was shopping at another store. The Target store security apprehended Sheila and called the police.

4

Defendant responded to the call and apprehended Cassie in the Target parking lot. Defendant told her if she lied to him, he would take her to jail and tow her car. Defendant put Sheila and Cassie in the back seat of his patrol car. Meanwhile, Yvette went home and received a text message from Cassie stating, "He wants us to take dirty pictures." Yvette texted Cassie to call 911. Cassie responded, "I can't. [Defendant] said that if I take the pictures, he will let me go."

While talking to the women, defendant learned that Cassie was a stripper. Defendant drove the two women to an alley behind the Target store, noting where there were no cameras. He told them he could release them without taking them to jail, but he would need "something in return." Defendant suggested taking "dirty pictures" and told the women he would let them go if they took photographs of their bare breasts and genitalia. The women flirted with defendant, hoping they would be released. Defendant handed Sheila a camera. The women took photographs of each other's breasts and buttocks, to avoid going to jail. Defendant told the women he would not take them to jail because they took photographs for him. He issued them tickets and let the women go.

**Jill (Counts 7 and 8)**

On May 2, 2007, mall security apprehended Jill for shoplifting at a Mervyn's store. Defendant responded to the scene, handcuffed Jill, and placed her in the back of his patrol car. Jill mentioned to defendant that she was a stripper. While Jill was in the patrol car, defendant transported two other shoplifting suspects to jail and the juvenile detention center. After dropping off the two other suspects, defendant drove Jill to a dark isolated location and removed Jill's handcuffs. Defendant told her she would probably

5

go to prison for three years because she had prior theft offenses. Defendant asked Jill if he could take pictures of her exposed breasts and to lift up her shirt. Jill complied because she was scared and afraid to go to prison.

Defendant then drove Jill to a secluded area in the desert and asked what he would get in exchange for "cite-releasing" her. It was about 11:00 p.m. Jill asked what defendant wanted her to do. Defendant unzipped his pants and Jill orally copulated him because she was afraid to go to prison. Defendant released Jill with a ticket, instead of taking her to jail. On two subsequent occasions, defendant showed up at Jill's work and asked her to take more photographs of herself. He gave her a camera, which Jill used to photograph.

## Carrie (Counts 9, 10, and 11)

On September 1, 2006, Carrie called the police and requested a welfare check on her children, who were with her estranged husband. Carrie's husband had been calling her while drunk. Carrie was reluctant to call the police because she had an outstanding arrest warrant for an unpaid ticket. In response to Carrie's request for a welfare check, defendant called Carrie and said her children were okay but he needed to meet with her. Defendant picked up Carrie in his patrol car and drove her around the corner and parked. They talked about Carrie's husband. Carrie told defendant her husband got very jealous. Defendant replied, "Well, you're hot. Do you blame him?" Defendant told Carrie he could help her with her custody dispute paperwork, and then told her he would have to take Carrie to jail because of her warrant.

6

Carrie pleaded with defendant to release her because she was in the middle of a custody battle. Defendant said he would be "putting [his] job on the line" by not taking her to jail. He asked Carrie what she could do for him, since he needed "to get something out of this." Carrie cried and begged defendant not to take her to jail. Defendant told her she would have to spend four days in jail. Defendant again asked Carrie what she would do for him if he helped her out. Carrie asked what he wanted. Defendant said, "How about a little Girls Gone Wild?" Carrie knew this referred to women flashing their bare breasts. Defendant said, "I want to see it now" because he was "putting [his] job on the line" for her. He added, "I'm doing this for you, you've got to do something for me." Carrie refused. Defendant said he would have to arrest her and took her telephone. Defendant looked at nude photographs of Carrie on her telephone, rubbed his genitals, made grunting noises, and said she was "hot." Carrie was scared "[o]ut of [her] mind." Eventually defendant released Carrie without arresting her. Defendant called Carrie the next day, offering to help her with her custody dispute paperwork. Carrie told him she could not talk to him at that time. Defendant continued to call Carrie over the next few days but Carrie did not answer or return his calls.

A month later, defendant pulled Carrie over during a traffic stop and did not initially recognize her. Defendant said she looked familiar and then remembered who she was. Defendant asked if Carrie had taken care of her warrant. Carrie said she had not. Defendant said he might have to take her to the police station. Carrie's nine-year-old daughter was in the car crying. Defendant told Carrie to go over to his patrol car and give him her cell phone. Carrie complied. Defendant used his digital camera to take

7

photos of pictures on Carrie's cell phone. Defendant also took pictures of Carrie's chest. He told Carrie to promise to call him to take pictures of her another day, and let her go. Carrie never called defendant. Carrie reported the incident to the police and received $75,000 from the sheriff's department in a civil settlement.

**Christina D. (Count 12)**

In March or April 2007, defendant arrived at Christina D.'s home and arrested her for an outstanding $250,000 warrant. He drove Christina D. to a Burger King, bought her a milkshake, and then drove her to somewhere in the desert and parked the car. Defendant told Christina D., "now I want to see all your tattoos. And just think of it as Girls Gone Wild." Christina D. assumed defendant wanted her to show him her breasts. She was in "shock." Christina D. showed defendant her tattoos on her chest and stomach but not on her breasts. Defendant drove Christina D. to the courthouse and then home.

**Jennifer and Jaime (Counts 13, 14, 15, and 16)**

In early September 2006, Jennifer and her friend, Jaime, called for a sheriff's deputy to assist with the custody transfer of Jaime's children to her husband. Jaime wanted an officer present to "keep the peace" during the custody transfer. Defendant responded to the call. He discovered Jaime had an outstanding warrant for failing to appear for a traffic ticket. Defendant told Jaime he was taking her into custody. Jaime started crying and Jennifer pleaded with defendant not to take Jaime into custody. Defendant responded, "Well, if this were Girls Gone Wild, then it didn't have to be this way." Defendant referred to "Girls Gone Wild" several times and said he needed "a visual," which Jennifer believed meant, that if she showed him her breasts, he would let

Jaime go. Jennifer refused to comply. She told defendant she "had morals." Jennifer cried and pleaded with defendant not to arrest Jaime. Jennifer overheard defendant make a telephone call, during which he said, "She didn't want to make a deal, so I have to take her in." Defendant placed Jaime in his patrol car. Jennifer stood outside the car and watched defendant drive off with Jaime. Jennifer called her fiancé and told him about the incident. She also reported the incident to defendant's watch commander. Later that night at about midnight, defendant called her and apologized for putting her in an uncomfortable position.

Defendant drove Jaime to a secluded area and told her to get in the front seat. He told her, "We could have just made a deal," "you wouldn't be going to jail." As defendant stood in front of the open front passenger door where Jaime was sitting, he unzipped his pants. Defendant told Jaime she could "still make a deal," and he wanted her to orally copulate him. Jaime refused and told him to take her to jail. Defendant pulled Jaime toward him. She was really scared. Defendant said, "[a]ll right, get in back," and drove Jaime to jail. Jaime did not report the incident. The following day, after Jaime's release, defendant called her and asked if there was anything he could do to assist with her ex-husband and offered to take her out to lunch. Jaime declined his offers.

**Dana (Counts 17, 18, 19, and 20)**

In May 2005, Dana and her boyfriend, Robert, drove to the grocery store. They were both under the influence of methamphetamine. Robert remained in the car while Dana went inside the market. Robert was on parole, with a warrant out for his arrest. When Dana exited the store, a patrol car was parked behind Robert's car. Dana saw

9

Robert sitting in the back of the patrol car. Dana did not walk back to Robert's car. She went into a video store because she feared Robert would be angry with her since it had been her idea to go to the store and Robert's arrest warrant arose from Dana accusing Robert of stealing her car.

As Dana walked out of the video store, defendant drove up to her, with Robert in the backseat. Defendant exited the patrol car and approached Dana. Defendant told her he wanted to discuss the drugs found in Robert's car, and told her to get in the backseat of his patrol car. When Dana got in the back seat with Robert, defendant told Dana to "keep [her] clothes on," which surprised her. When she asked Robert what was going on, he said, "This cop is cool." "Don't worry, he's not going to take [you to] jail, he's going to let you get the car."

Defendant drove back to the market with Dana and Robert. He searched Robert's car and Dana's belongings. He looked through photographs on Dana's digital camera, which included nude photographs of Dana. Defendant gave Dana's friend, Lisa, the keys to Robert's car. Defendant asked Dana and Robert, "What do I get out of it? What do I get out of it?" Dana thought Robert had arranged for her to do something sexual for defendant. Dana was afraid. Defendant drove the patrol car into a church parking lot. Dana said she would not do anything in the church parking lot.

Defendant drove down a dirt road to another location and parked the car. While defendant sat in the front seat looking in the rear view mirror, Dana attempted orally copulating Robert. Several times while Dana was in the patrol car, defendant said, "What am I going to get out of it?," and Dana showed him her breasts. Dana feared that if she

10

did not, she would be arrested. Dana performed the sexual acts because of defendant's position of authority. Defendant told Dana he would not impound Robert's car or take Dana to jail if defendant could take nude pictures of Dana later on. Defendant then dropped off Dana and Robert at Lisa's house, where they were staying. He told them that if they told anyone about the incident or if Dana did not let him take photographs of her, he would kill them.

Immediately after defendant dropped off Dana and Robert, Dana told Lisa what had happened. Dana later called defendant and told him she did not want him to take nude photographs of her. He said she could think about it and call him if she changed her mind.

Dana encountered defendant again when she was arrested for shoplifting at Mervyn's in 2007. She was extremely scared because she knew defendant would be the officer who would apprehend her and she had not let him take nude photographs of her. When defendant arrived, he asked her if he knew her from somewhere. She said yes. Defendant placed Dana in the back of his patrol car, handcuffed, and made a stop at a motel parking lot to look for a suspect. After talking to the suspect, defendant returned to the car and twice asked Dana to show him her chest. She complied, and defendant said, "those are nice." Defendant issued Dana a citation, dropped her off at her home, and said he wanted to see her again. Dana did not report the 2005 and 2007 incidents until later in 2007, when she was arrested again for theft.

11

**Jessica (Count 21)**

On November 6, 2005, Jessica got into an argument with her parents. Jessica called the police and reported that her father slapped her. Defendant responded to the call. When defendant told Jessica he was sending her home with her parents, Jessica threatened to kill herself because she knew defendant would then have to take her into custody. Defendant transported Jessica to Arrowhead Regional Medical Center. On the way, defendant asked Jessica multiple times to show him her breasts. He said, "[c]ome on, can't you just flash me like Girls Gone Wild?" Jessica refused to comply. After arriving at the hospital, Jessica reported the incident to hospital social workers.

**Andrea (Counts 22, 23, and 24)**

In early 2005, Andrea and her boyfriend, Skoti, were fighting at a Howard Johnson Hotel. Skoti hit Andrea and fled. The police were called. Defendant was one of the officers who arrived. He told the other officers to go look for Skoti while he took care of the situation at the hotel. Defendant inspected Andrea's hotel room, shut the door, and closed the blinds. He then asked Andrea, "What is such a fine woman like you doing with a man like that?," and repeatedly asked Andrea if he could see her breasts. She eventually complied because she was scared and felt intimidated. She feared she would go to jail because, when Skoti hit her, she hit him back. Defendant offered to pay for a room for Andrea at Green Tree Motel and said he wanted to see her there when he got off work. Andrea agreed to whatever he said and gave him her telephone number.

After defendant left, Andrea did not go to the Green Tree Motel. Andrea did not report the incident. When the police arrested Skoti, Andrea told the deputies that they

12

had better release Skoti or she would report that defendant had asked to see her breasts. Andrea later reneged on her accusation because she was afraid she would be arrested and would not be believed. Defendant called her and asked why Andrea was complaining. She told him he better release Skoti or she would report defendant's behavior. Skoti was released.

Andrea had further contact with defendant on August 13, 2006, at the Days Inn. Andrea was with a different boyfriend, Jason, and a friend, Julie, when the police arrived and arrested Jason and Julie for outstanding arrest warrants. Andrea testified that Jason and Julie were under the influence of methamphetamine and Andrea was under the influence of Ecstasy. However, the police tested her for drugs and she "passed the test" and was not arrested. The police searched Andrea's vehicle and found sex toys. Andrea asked the officers if they knew defendant because, although she was afraid of him, she thought he might help her avoid being arrested.

Twenty minutes later defendant arrived at the scene and told the other deputies that he would handle the matter. He walked Andrea across the street to her hotel room to search for drug paraphernalia. Defendant found methamphetamine pipes in Andrea's room and advised her that each pipe carries a 10-year sentence. Defendant told Andrea she could avoid this by orally copulating him. Andrea complied because she was scared and feared being arrested. Defendant then smashed the pipes. Defendant released Andrea without arrest. Andrea reported the incident in December 2008.

**Defendant's Testimony**

Defendant testified that, as to Christina, she flirted with him and surprised him by taking off her shirt and bra. When she did this, his "instinct was just to take pictures." Defendant denied putting his mouth on Christina's breasts.

As to Sheila and Cassie, defendant testified that the women asked him about his hobbies and he told them he was interested in photography. Cassie asked to see his camera so she could take pictures of Sheila and Cassie in the back of the patrol car. Defendant gave Cassie his camera. While defendant was doing paperwork, he heard her taking photographs. He did not watch in his rear view mirror or see the women taking pictures of themselves. There was no discussion about the women taking revealing photographs. When defendant finished his paperwork and the women were done taking photographs, they returned the camera to defendant. Defendant denied asking the women to take revealing pictures of themselves or to take photographs of themselves in exchange for leniency.

With regard to Jill, defendant testified that she may have offered to provide him with drug-related information in order to avoid being arrested. Defendant permitted her to sit in the front seat of the patrol car and they flirted with each other. Jill asked defendant if he wanted to see her breasts and, before he knew it, she was exposing her breasts to him. Defendant took two or three photographs of her chest. He did not offer Jill leniency in exchange for the photographs. He just liked taking photographs. Defendant denied asking Jill to perform oral sex or having oral sex with her.

14

As to Carrie, defendant testified that she offered to show him nude photographs of herself. She "just seemed proud to show herself off." Defendant denied asking her to lift her shirt, reveal her chest to him and allow him to take photographs of her. He also denied offering to treat her leniently by not arresting her on her warrant in exchange for Carrie lifting her shirt, exposing her breasts, allowing him to take photographs of her, or providing him with sexual favors.

Defendant denied asking Christina D. to show him her tattoos. He claimed he only asked her where they were. Defendant also denied asking Jaime to show him her breasts and orally copulate him. Defendant denied assisting Dana and Robert in exchange for sexual favors or for Dana exposing her breasts. Defendant denied that Dana exposed her breasts in his patrol car or that Dana and Robert had intercourse in the back of his patrol car. Defendant also denied asking Jessica or Andrea to lift up their shirts or for any sexual favors. Defendant testified that the only sexual conduct that he participated in with women in his custody involved the women whose nude pictures were found in his possession. Those women were Christina, Cassie, Sheila, and Jill.

III

MOTION TO QUASH OR TRAVERSE THE SEARCH WARRANT

Defendant contends the trial court erred in denying his motion to quash and traverse the search warrant authorizing a search of defendant, his personal locker at the police station, defendant's personal vehicle, and his residence. Defendant challenges the search warrant on the ground the supporting affidavit contained misleading and omitted material facts, and the remaining contents of the affidavit were insufficient to establish

15

probable cause. The trial court rejected this contention, explaining: "[The trial] Court finds there's a substantial basis to support the probable cause for the warrant. And although there's a summary that is not 100 percent accurate, the Court does not find that there's been deliberate false – falsehoods or wreckless disregard for the truth."

We agree defendant has not met his burden of establishing that the supporting affidavit contained deliberate falsehoods and omissions or constituted a reckless disregard for the truth. (*People v. Luttenberger* (1990) 50 Cal.3d 1, 14-15 & fn. 4; *People v. Bradford* (1997) 15 Cal.4th 1229, 1297.) In reviewing the issuance of the search warrant, "[o]ur task, as a reviewing court, is to determine whether 'the magistrate had a "substantial basis for . . . conclud[ing]" that a search warrant would uncover evidence of wrongdoing.' [Citation.]" (*People v. Tuadles* (1992) 7 Cal.App.4th 1777, 1784.)

The search warrant in the instant case was supported by Detective Jiles' affidavit summarizing defendant's conversation with Christina during a recorded pretext telephone call. Jiles stated in his supporting affidavit that, "During the call, the victim asked Linderman what he did with the pictures depicting her breasts. He does not deny taking them and told her he destroyed the pictures that weren't pertinent to the investigation and that she did not have to worry about anything on 'his end.'" Jiles concluded in his affidavit that, "Based on the investigation, I feel that Linderman is in possession of electronic media that has pictures of the victim exposing her bare breasts."

When taking into consideration the pretext telephone call conversation as a whole, the court could reasonably conclude that defendant did not expressly deny taking nude

16

photographs of Christina. When Christina asked defendant, "But nobody's going to find out about those pictures that were [taken] at the mall?," defendant said "No. Everything in the case is confidential, and that's it." When Christina asked defendant what he did with the nude photographs, he abruptly ended the conversation, without expressly denying he took the photographs. Defendant merely said he did not understand what Christina was talking about and then said he had to hang up because of his telephone battery. This conduct could reasonably be construed as defendant being evasive in order to avoid directly discussing Christina's accusations. Under such circumstances, Jiles did not make a clear misstatement of the facts and Jiles's interpretation of the conversation was reasonable. We therefore conclude Jiles did not knowingly or intentionally misstate the facts in his supporting affidavit.

Furthermore, there were more than sufficient other facts to support the search warrant and the factual omissions in the affidavit were not sufficiently material to defeat a finding of probable cause to search, when considering the totality of the circumstances. (*People v. Bradford, supra,* 15 Cal.4th at p. 1297.) Defendant complains that Jiles omitted from the affidavit that Christina told defendant during the pretext call that her husband made up the allegations against defendant and defendant had said he did not understand what Christina was talking about regarding the nude photographs. Even assuming the alleged misstatements were excised from Jiles's supporting affidavit and the factual omissions were taken into account, the affidavit provided probable cause to search defendant's residence. We therefore conclude the trial court properly denied

17

defendant's motions to quash and traverse the search warrant. (*People v. Aho* (1985) 166 Cal.App.3d 984, 989-993.)

IV

EXCLUSION OF EXPERT WITNESS TESTIMONY

Defendant contends the trial court abused its discretion and violated his constitutional rights to due process and to present a defense, by excluding expert testimony by Dr. Thomas Streed, on the effects of ecstasy and methamphetamine use to refute Andrea, Collin, and Dana's testimony. During the prosecution's case, Andrea, Collin, and Dana testified they used methamphetamine and ecstasy around the time of the charged incidents.

After the prosecution rested its case, the trial court conducted an Evidence Code section 402 hearing (402 hearing) to determine the admissibility of Dr. Streed's expert testimony. Dr. Streed testified during the 402 hearing that methamphetamine's affects differed from person to person. Even in small doses, it can affect a person's sensory perceptions but there is no certainty as to how an individual is going to react to a specific amount of methamphetamine. Methamphetamine distorts reality and time. The effects of ecstasy are similar. Dr. Streed agreed that, "depending on the person, depending on the amount of usage, depending on how chronic their usage is, depending upon the nature and the extent under which they're using, these are all variables that can factor in as to what level of the drug, if any, might alter their perception of an event." Dr. Streed did not interview Andrea, Skoti and Dana or review their statements. He also did not have any information regarding the amount of drugs Andrea, Skoti and Dana ingested. He

18

therefore was unable to determine how much of an influence the drugs had on the witnesses in the instant case. The prosecution objected to Dr. Streed's testimony on the basis of Evidence Code section 352. The trial court agreed and excluded the evidence.

Evidence of the use of narcotics is admissible if it "tends to show that the witness was under the influence thereof either (1) while testifying, or (2) when the facts to which he testified occurred, or (3) that his mental faculties were impaired by the use of such narcotics." (*People v. Hernandez* (1976) 63 Cal.App.3d 393, 405.) Such evidence may be excluded, however, under Evidence Code section 352 "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "A claim that expert opinion evidence improperly has been admitted is reviewed on appeal for abuse of discretion." (*People v. Catlin* (2001) 26 Cal.4th 81, 131.)

In the instant case, the trial court found that Dr. Streed's testimony regarding the effects of methamphetamine and ecstasy was in a broad sense relevant to witnesses' ability to perceive and recollect what occurred, but the probative value was substantially outweighed by the probability the jury would be confused or mislead. We agree. There was no abuse of discretion in excluding Dr. Streed's generic testimony on the properties and general effects of methamphetamine and ecstasy because there was insufficient evidence of Andrea, Skoti and Dana's actual state of intoxication and ability to perceive and recollect the facts of the charged offenses. Skoti testified both he and Andrea were using methamphetamine the day of the charged offense, but Andrea testified that she had

19

not used any methamphetamine the day of the charged offense in August 2006, and she tested negative for drugs. Skoti also testified that his use of methamphetamine did not influence his perception or affect his memory at the time of the charged offense. Dana's testimony also indicated that she was not actually under the influence of methamphetamine. She said she had not recently used drugs and, by the time defendant picked her up in his patrol car, she was not feeling the effects of methamphetamine. There was no testimony as to how much methamphetamine or ecstasy Andrea, Skoti and Dana ingested or what their reaction was to taking the drugs.

Furthermore, according to Dr. Streed, the effects of methamphetamine and ecstasy can vary from person to person. Dr. Streed's testimony thus would lead to the jury speculating about the impact of the drugs on the witnesses. "'[E]xclusion of evidence that produces only speculative inferences is not an abuse of discretion.'" (*People v. Cornwell* (2005) 37 Cal.4th 50, 81, quoting *People v. Babbitt* (1988) 45 Cal.3d 660, 684.) Here, the trial court acted within its discretion in concluding that, even if relevant, the very limited and speculative relevance of the evidence and its marginal probative value was outweighed by the potential that the evidence would confuse the jury and lead to unsubstantiated speculative findings.

V

INTERNET POSTINGS

Defendant contends the trial court erred in not allowing defense counsel to authenticate three Internet postings, including three photographs and writings, and then excluding the evidence because it was not properly authenticated. The proposed Internet

postings showed a person, who appeared to be Dana, soliciting individuals to participate in or watch Dana and another individual engage in sexual intercourse.

The trial court excluded the Internet postings on the grounds they were not relevant and there was insufficient foundation for the photographs because it was unknown who posted the photographs and whether Dana consented to the postings. The admissibility of the Internet postings and photos "'has two components: (1) whether the challenged evidence satisfied the "relevancy" requirement set forth in Evidence Code section 210, and (2) if the evidence was relevant, whether the trial court abused its discretion under Evidence Code section 352 in finding that the probative value of the [evidence] was not substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice.'" (*People v. Heard* (2003) 31 Cal.4th 946, 972, quoting *People v. Scheid* (1997) 16 Cal.4th 1, 13.) We apply the abuse of discretion standard of review when determining the admissibility of the Internet postings and photographs. (*People v. Crittenden* (1994) 9 Cal.4th 83, 134.)

Defendant argues the Internet postings were relevant to show that Dana initiated engaging in lewd conduct in front of defendant in his patrol car. But at trial, Dana testified she would not have engaged in sex with Robert in defendant's patrol car and flashed her breasts, had defendant not been a law enforcement officer in a position of authority. The Internet postings therefore had very little, if any, relevance because the photographs were not relevant to defendant's defense. Defendant denied requesting or receiving any sexual favors from Dana. Rather, defendant argued the alleged sexual acts did not happen at all.

21

Because the Internet postings had very little, if any relevancy, their probative value was far outweighed by their prejudicial nature under Evidence Code section 352, and therefore it is not reasonably probable that had the Internet postings been admitted, the trial outcome would have been more favorable to defendant. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

## VI

## SUFFICIENCY OF EVIDENCE AS TO COUNTS 6 AND 18

Defendant argues there was insufficient evidence to support his convictions for solicitation to engage in lewd conduct in public (§ 647, subd. (a); counts 6, 18).

*A.  Count 18*

Defendant argues, and the People agree, count 18 is barred by the statute of limitations because the statute of limitations expired before the initial complaint was filed on September 7, 2007.  The information, as amended, alleges in count 18 that defendant committed the misdemeanor offense of violating section 647, subdivision (a), in May 2006.  The statute of limitations for a misdemeanor offense is one year (§ 802, subd. (a)).  Accordingly, defendant's conviction on count 18 is barred by the statute of limitations and must be reversed.

*B.  Count 6*

Defendant contends, as to count 6, that there was insufficient evidence of a touching or that the act occurred in a public place under section 647, subdivision (a).  Subdivision (a) of section 647 proscribes two types of conduct in a public place: (1) soliciting another to engage in lewd conduct and (2) engaging in lewd conduct.  "The

22

Supreme Court has construed 'lewd or dissolute conduct' to mean 'conduct which involves the *touching* of the genitals, buttocks, or female breast for the purpose of sexual arousal, gratification, annoyance or offense . . . .' [Citation.]" (*People v. Meeker* (1989) 208 Cal.App.3d 358, 362; *Prior v. Municipal Court* (1979) 25 Cal.3d 238, 256.) There thus must be evidence the solicitation was for a touching and the touching was done for the purpose of arousal.

Defendant argues there was insufficient evidence of a touching because his conviction for count 6 was based on Sheila's testimony that defendant asked her to flash her breasts and touch them herself. Defendant acknowledges there was incidental touching when Sheila lifted her shirt to expose her breasts, but defendant argues he did not ask her to touch her breasts for his sexual satisfaction. Even if the touching was incidental, the jury could have reasonably found that defendant knew that Sheila could not have exposed herself without touching her breasts and defendant intended to watch for the purpose of sexual gratification. Section 647, subdivision (a), only requires the defendant, by words or conduct to solicit another person to engage in touching her own genitals or breasts. There is no defined requisite level of touching.

There also was ample evidence the section 647, subdivision (a), offense occurred in a public place. The touching incident occurred in a patrol car parked behind a Target store, where nearby there were other department stores and businesses, including a Kaiser hospital and fast food restaurants. In such a location, defendant reasonably should have known that someone was likely to be present in the area and would be offended by viewing the women taking nude pictures of themselves in defendant's patrol car.

23

SUFFICIENCY OF EVIDENCE OF REQUESTING OR TAKING A BRIBE

Defendant contends there was insufficient evidence of each conviction for requesting or taking a bribe (§ 68, subd. (a); counts 3 (Christina), 4 (Cassie), 5 (Sheila), 7 (Jill), 9 (Carrie), 11 (Carrie), 13 (Jennifer), 15 (Jaime), 17 (Dana), 19 (Dana), and 24 (Andrea)).

Section 68 requires proof that the defendant requested, took, or agreed to take a bribe. (§ 68.) In the instant case, the trial court instructed the jury that: "To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant was an executive officer . . . ; [¶] 2. The defendant requested, took, or agreed to take a bribe; [¶] 3. When the defendant requested, took or agreed to take the bribe, he represented that the bribe would unlawfully influence his official act or decision. The representation may have been express or implied; AND, [¶] 4. The defendant acted with the corrupt intent that his public or official duty would be unlawfully influenced." (CALCRIM No. 2603.) The court further instructed that "*Requesting or agreeing to take a bribe* does not require specific words or behavior, as long as the language used and the circumstances clearly show that the person is seeking a bribe from someone else. The People do not need to prove that the other person actually consented to give a bribe."

With regard to the term, "bribe," section 7 states: "The following words have in this code the signification attached to them in this section, unless otherwise apparent from the context: . . . [¶] 6. The word 'bribe' signifies anything of value or advantage, present or prospective, or any promise or undertaking to give any, asked, given, or accepted, with

24

a corrupt intent to influence, unlawfully, the person to whom it is given, in his or her action, vote, or opinion, in any public or official capacity." Section 68 does not define the term, "bribe."

The court instructed the jury that the term, "bribe," "means something of present or future value or advantage, or a promise to give such a thing, that is requested or taken with the corrupt intent that the public or official action, vote, decision, or opinion of the person who is requesting, taking, or agreeing to take the bribe, will be unlawfully influenced."

Collectively, sections 68 and 7 "thus define bribery as the giving or receipt of something of value, with the intent that the recipient be influenced in his or her vote, action, or opinion, in an official capacity (and in the case of the recipient with respect to 'any matter then pending or which may be brought before him . . .' (§ 68))." (*People v. Gaio* (2000) 81 Cal.App.4th 919, 928.)

Defendant argues there was insufficient evidence to support his convictions for requesting or taking a bribe, because soliciting the victims to expose their bare breasts did not constitute "a thing of value" or "advantage" within the meaning of sections 68, subdivision (a), and 7. Defendant asserts that, considering section 68 as a whole, the terms, "a thing of value" and "advantage," were intended to have an ascertainable value. We disagree.

In construing a statute, this court must ascertain the intent of the Legislature so as to effectuate the purpose of the law. (*People v. Coronado* (1995) 12 Cal.4th 145, 151.) In determining that intent, we first examine the words of the statute, applying "'their

25

usual, ordinary, and common sense meaning based upon the language . . . used and the evident purpose for which the statute was adopted.'" (*People v. Granderson* (1998) 67 Cal.App.4th 703, 707, quoting *In re Rojas* (1979) 23 Cal.3d 152, 155.) ". . . 'If there is no ambiguity in the language of the statute, "then the Legislature is presumed to have meant what it said, and the plain meaning of the language governs." [Citation.] "Where the statute is clear, courts will not 'interpret away clear language in favor of an ambiguity that does not exist.' [Citation.]"' [Citation.]" (*Coronado,* at p. 151.) If the words of the statute are ambiguous, a court may resort to "extrinsic sources, including the ostensible objects to be achieved and the legislative history." (*Ibid.*) Applying these rules of statutory interpretation, a court "'must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences.' [Citation.]" (*Ibid.*)

The plain language of sections 68 and 7, collectively, is unambiguous. In construing these statutes collectively we look to the plain meaning of the words, "bribe" and "thing of value." As commonly understood, a bribe is "1. money or favor given or promised in order to influence the judgment or conduct of a person in a position of trust" or "2. something that serves to induce or influence." (Merriam-Webster's Collegiate Dict. (10th ed. 1999) p. 142.) This definition is consistent with the legal definition of bribe as set forth in section 7, subdivision (6), which states: "[t]he word 'bribe' signifies anything of value or advantage, present or prospective, or any promise or undertaking to give any, asked, given, or accepted, with a corrupt intent to influence, unlawfully, the

26

person to whom it is given, in his or her action, vote, or opinion, in any public or official capacity." (§ 7, subd. (6).) The common meaning of the term, "value," as defined in the dictionary, is: "a fair return or equivalent in goods, services, or money for something exchanged." (Merriam-Webster's Collegiate Dict. (10th ed. 1999) p. 1305.)

Here, the victims exchanged sexual favors for prosecutorial leniency. The sexual favors constituted a "bribe" and were a "thing of value" to defendant. Although the victims' sexual favors had no ascertainable monetary value, they were a favor or service of value to defendant, requested by him, in exchange for something else, leniency. The sexual favors were something he desired because they provided him with sexual gratification.

We conclude section 68 is sufficiently clear and therefore its plain meaning should be followed, without reading unspecified restrictions into it, such as limiting the term, "bribe," to only that which has a quantifiable value. Evidence that defendant exhorted the victims to exchange sexual favors in return for defendant providing leniency was thus sufficient to support defendant's convictions for soliciting a bribe.

VIII

SUFFICIENCY OF EVIDENCE OF ORAL COPULATION

Defendant contends there was insufficient evidence to support his conviction in count 8 for oral copulation under color of authority (§ 288a, subd. (k)). Specifically, he argues there was insufficient evidence that the victim, Jill, did not consent to committing oral copulation.

27

Under section 288a, subdivision (k), the crime of oral copulation under color of authority is committed when a person "commits an act of oral copulation, where the act is accomplished against the victim's will by threatening to use the authority of a public official to incarcerate, arrest, or deport the victim or another, and the victim has a reasonable belief that the perpetrator is a public official, . . ." The trial court instructed the jury that, in order to find defendant guilty of committing oral copulation under color of authority, the People must prove: "1. The defendant committed an act of oral copulation with someone else; [¶] 2. The other person did not consent to the act; AND [¶] 3. The defendant accomplished the act by force, violence, duress, menace or fear of immediate and unlawful bodily injury; or, [¶] threatening to use the authority of a public office to incarcerate, arrest or deport someone . . . . The other person must have [reason to believe] that the defendant was a public official even if he was not. [¶] . . . [¶] In order to consent, a person must act freely and voluntarily and know the nature of the act."

In count 8, defendant was charged with oral copulation against Jill's will by threatening to arrest, incarcerate and deport her. There was evidence presented at trial that, after Jill was caught shoplifting, defendant drove Jill to a dark isolated location and told her she would probably go to prison for three years because she had prior theft offenses. After Jill complied with defendant's request to take pictures of her exposed breasts, defendant drove Jill to a secluded area in the desert and asked her what he would get in exchange for "cite-releasing" her. Defendant unzipped his pants and pulled his penis out. Jill testified she orally copulated defendant because she did not want to go to jail.

28

Jill's testimony established that she did not consent to orally copulating defendant, and therefore there was sufficient to support defendant's conviction on count 8.

IX

PROSECUTORIAL ERROR

Defendant argues that the prosecutor committed numerous instances of prejudicial prosecutorial error. Because defendant did not object in the trial court to the misconduct raised on appeal, defendant forfeited his prosecutorial misconduct objections. (*People v. Stanley* (2006) 39 Cal.4th 913, 952; *People v. Samayoa* (1997) 15 Cal.4th 795, 841.) In any event, defendant's claims are not meritorious.

A. *Relying on Facts Outside the Record*

Defendant asserts the prosecutor erred in making the following statement during closing argument: "It is very likely that you're going to go back in the jury room and wonder why there aren't more charges about some of these victims. Well, in some cases there may be a technical reason, in other cases it may be – maybe there should be another charge. But that's not the question before you. The question before you is, is the defendant guilty of the charges with which he is facing." Defendant contends this argument was improper because the prosecutor referred to there being "technical reasons" why charges might not have been brought and this concerned facts outside the record. Defendant asserts it was improper to tell the jury the prosecution could or should have been able to file additional charges but, for some unknown reason, did not do so.

29

Such remarks were not improper. They constituted fair comment on the evidence presented at trial and were benign. "Prosecutors have wide latitude to discuss and draw inferences from the evidence at trial." (*People v. Dennis* (1998) 17 Cal.4th 468, 522.) The prosecutor's comments were founded on the state of the evidence and the potential for the jury to question why certain charges were not filed. The prosecutor merely noted the obvious and appropriately admonished the jury that it should not be concerned with this. Furthermore, even if the remarks were improper, such error was harmless.

B. *Misstating the Evidence*

Defendant argues the prosecutor committed prosecutorial misconduct when, during closing argument, the prosecutor mischaracterized Dana's trial testimony by stating: "Almost a year later she had contact with him again when she got arrested at the Mervyn's, again for shoplifting. Remember there was some testimony that she became very scared when she saw it was him. She said that she actually wet her pants." Defendant asserts this was a misstatement of Dana's testimony because she actually testified that she wet her pants earlier, when she was apprehended by loss prevention officers.

The People acknowledge this was a misstatement, since Dana testified she wet her pants when she was apprehended by store security, before defendant arrived. But this was a minor inaccuracy, as to one particular fact, which in all probability had little, if any, impact on the outcome of the trial. Furthermore, there is no indication that the misstatement was intentional. Because it did not amount to ""use of deceptive or reprehensible methods to attempt to persuade either the court or the jury,"" it does not

30

constitute prejudicial prosecutorial misconduct. (*People v. Espinoza* (1992) 3 Cal.4th 806, 820.)

*C. Disparaging Defense Counsel and Defendant*

Defendant contends the prosecutor improperly disparaged defense counsel by telling the jury that defense counsel had misled them on the facts and law. Defendant argued during closing argument that there was no evidence defendant asked Jill to orally copulate him. During rebuttal, the prosecutor gave the jury a hypothetical, in which a high school freshman was asked to recall an event. The prosecutor stated: "Now, if you were a defense attorney looking to tear apart that high school freshman, who's now a high school senior, would you focus on some things they don't remember? Sure. What can you do to try and disprove that person's experience? You can mislead about the facts." The prosecutor added that "you can emphasize the things that should be there. . . . [¶] You can mislead about the law. Well, for example, when counsel was talking to you about the instruction for oral copulation with relation to [Jill], he stood up here and told you that if he didn't ask for it [oral copulation], . . . , or words to that effect, that it's not a crime."

These statements were proper because they were in response to defense counsel's argument the prosecution had not proved defendant asked Jill to orally copulate him. Under the law, an express request was not necessary for a conviction. The prosecutor appropriately noted various ways the defense could discredit witnesses and refute the charges, and cautioned the jury to wary of defense's arguments on the law and facts. "[T]he prosecutor has wide latitude in describing the deficiencies in opposing counsel's

31

tactics and factual account." (*People v. Bemore* (2000) 22 Cal.4th 809, 846.) Here, the prosecutor did not commit misconduct by urging the jury not to be misled by defense counsel's incorrect suggestion that an oral copulation conviction required evidence that defendant specifically asked Jill to orally copulate defendant, when such evidence was not required.

Defendant also argues the prosecutor improperly argued defense counsel misled the jury as to facts regarding photographs Jill took of herself and sent to defendant a month after the oral copulation incident. Defendant argued Jill willingly sent the photographs to defendant's cell phone. The photographs show her posing and smiling, and defendant was not present when they were taken. The prosecutor argued Jill was coerced into taking the photographs. During rebuttal, the prosecutor argued that the photographs did not come off defendant's cell phone and suggested defense counsel had misled the jury as to the facts. The prosecutor's argument constituted fair comment as to reasonable inferences based on the evidence.

Defendant also argues the prosecutor committed prosecutorial misconduct by making inflammatory remarks about defendant. Defendant objects to the prosecutor's statement characterizing defendant as a predator and analogizing him to a pack of lions preying on weak, old, young, and infirm gazelles that cannot defend themselves and easily flee. The prosecutor argued defendant preyed on the victims because he knew they were weak, emotional, had criminal histories, and would not make credible witnesses.

Defendant argues the prosecutor's argument that defendant preyed on the victims because he knew the jury would not believe the victims, was improper because it was

32

unsupported by the evidence. We disagree. The record supported such a finding. Most of the victims had been caught committing crimes, such as shoplifting, having outstanding warrants, or drug offenses, or needed assistance with a domestic violence incident or contentious child custody matter. One victim was a teenager and several disclosed to defendant that they were strippers. The evidence supports the prosecutor's argument that defendant preyed on his victims, knowing that the victims had criminal records, would likely not make credible witnesses, and were very vulnerable to being manipulated by bribes of prosecution leniency.

We conclude the prosecution's statements during rebuttal were well within the realm of acceptable argument. Even if the prosecution's statements were improper, we cannot say they constituted prejudicial error. It is not reasonably probable that the outcome would have been any different, had the prosecutor's statements not been made. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

*D. Misstating the Law*

Defendant complains of four instances of the prosecution misstating the law and burden of proof. Misstatement of the law during closing argument is misconduct. (*People v. Huggins* (2006) 38 Cal.4th 175, 253, fn. 21.) "'[I]t is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements. [Citation.]' [Citation.]" (*People v. Hill* (1998) 17 Cal.4th 800, 829-830, 832.)

Defendant argues that, during closing argument, the prosecutor improperly referred to the elements of count 6 (solicitation to engage in lewd conduct; § 647, subd.

33

(a)) as very technical.  The prosecutor argued:  "There is a Count 6, the instruction is 1162, that pertains to the charge specific to [Sheila], and that is soliciting another to engage in lewd conduct.  Of all the crimes the defendant is charged with, this one has the most elements.  It has a lot of requirements to it.  [¶]  You recall when defense counsel was talking to you at the very beginning of the case about being concerned about the defendant getting off on a technicality.  Well, this one's pretty technical."

Defendant argues this discussion of the elements of count 6 undermined the deliberative process.  We disagree.  The prosecutor's statement could reasonably be construed as conveying the caveat that the count 6 offense had numerous elements.  As a consequence, evaluating the evidence and defendant's liability would be a very technical process for the jury with consideration of the sufficiency of evidence as to each element.  Any failure to satisfy each element would result in the charges being dismissed.  There was no misstatement of the law in this regard or trivializing of the prosecution's burden of proof.

Defendant next argues that the prosecutor improperly argued several times during closing argument that evidence of a lie establishes guilt.  Defendant objected to the prosecutor arguing that it was the jury's job to discern the truth and this should be reflected in the verdict.  If the jury found defendant "to be a liar, ask yourself why he's lying.  And the only reason is because he is guilty."

Defendant asserts that this statement misstates the law because it incorrectly suggests that if one side is lying about something, the other side's version is necessarily true.  We do not find merit in this objection.  The instant case turned on who was telling

34

the truth, defendant or the victims. The prosecutor appropriately reminded the jury that the jury's determination of whether defendant was guilty turned on who was telling the truth. The prosecutor's statement in question appropriately emphasized the jury's responsibility to discern who was telling the truth, and to consider that, if the jury found defendant was lying, he was likely doing so because he was guilty. There was no misstatement of the law or trivializing of the burden of proof.

Defendant contends the prosecutor improperly argued during closing argument that the victims did not have a motive to lie, whereas he did have a motive to lie, because he was facing criminal charges for victimizing 11 women. Defendant argues this argument was improper because the prosecutor urged the jury to find defendant's testimony not credible solely because of his status as a criminal defendant. But this is not what the prosecutor was arguing. The prosecutor was arguing that defendant had a motive to lie because he was being charged with a crime and therefore had a motive to lie in order to avoid being convicted. There was no impropriety in the prosecutor arguing this.

Finally, defendant argues that the prosecutor improperly argued that the prosecution was not required to prove separately each element of each count. Defendant objects to the prosecutor's argument to the jury that it should not consider the victims' testimony in isolation. Rather, the jury should compare and consider as a whole the testimony of each victim. Defendant argues that the prosecutor's discussion of synergy was an incorrect statement of the law because it advocated finding defendant guilty of each crime without finding proof of each element of each crime.

We do not consider the prosecutor's argument improper or a misstatement of the law. The prosecutor did not tell the jury that the prosecution was not required to prove separately each element of each count. The prosecution merely suggested the jury compare the victims' testimony and consider it as a whole when making the required findings. There was nothing improper about such argument.

*E. Asking Defendant if Witnesses Were Lying*

Defendant contends the prosecutor committed misconduct when on numerous occasions he asked defendant on cross-examination whether defendant was saying the victims were wrong or lying during their testimony. Such questions are commonly referred to as asking "were they lying" questions. In *People v. Zambrano* (2004) 124 Cal.App.4th 228 [Fourth Dist, Div. Two], this court held, citing *People v. Melton* (1988) 44 Cal.3d 713, 744, that "were they lying" questions are improper because they serve no purpose other than to elicit the irrelevant lay opinion of one witness about the veracity of another witness. (*Zambrano*, at pp. 240-241.) We further held that a prosecutor who repeatedly asks such questions commits misconduct because the only purpose of the questioning is to berate the defendant in front of the jury and inflame the passions of the jury by forcing the defendant to call other witnesses liars. (*Zambrano*, at p. 242.) "Were they lying" questions are impermissible when argumentative or designed to elicit testimony that is irrelevant or speculative. A court may permit such questions, however, if the witness to whom they are addressed has personal knowledge that allows him to provide competent testimony that may legitimately assist the trier of fact in resolving credibility questions. (*People v. Chatman* (2006) 38 Cal.4th 344, 384.)

36

Defendant objects for the first time on appeal to over 14 instances of the prosecution asking defendant if the victims' testimony regarding defendant's conduct and statements to the victims was false. Defendant argues these questions were improper because the victims and defendant did not know each other personally, other than from defendant apprehending the victims. Defendant therefore did not know why they would lie. But defendant had personal knowledge that allowed him to provide competent testimony as to the veracity of the victims' testimony. Defendant was present and directly involved in the matters which were the subject of the prosecutor's inquiries regarding whether the victims had accurately testified to the facts. It therefore was not improper for the prosecutor to ask defendant if the victims' versions of the charged offense were correct. (*People v. Chatman, supra,* 38 Cal.4th at p. 384.)

"[I]n its discretion, a court may permit such questions if the witness to whom they are addressed has personal knowledge that allows him to provide competent testimony that may legitimately assist the trier of fact in resolving credibility questions." (*People v. Chatman*, *supra,* 38 Cal.4th at p. 384.) Here, defendant had personal knowledge that allowed him to testify as to whether or not the victims' versions of what occurred were correct. There was no prosecutorial misconduct in asking defendant on numerous occasions whether the victims' testimony regarding the charged offenses was correct.

X

SENTENCING

Defendant argues the trial court made several sentencing errors. The trial court denied probation and sentenced defendant to 20 years in state prison.

37

## A. *Imposing the Upper Term for the Base Offense*

Defendant contends the trial court improperly imposed the upper term of eight years for the base offense of oral copulation under color of authority (§ 288a, subd. (k); count 8). We disagree.

Under section 1170, "[w]hen a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the choice of the appropriate term shall rest within the sound discretion of the court." (§ 1170, subd. (b).) "The court shall select the term which, in the court's discretion, best serves the interests of justice." (*Ibid.*) A fact charged as an enhancement or that is an element of the crime may not be used to impose the upper term. (§ 1170, subd. (b); Cal. Rules of Court, rule 4.420(c), (d).) "When a trial court has given both proper and improper reasons for a sentence choice, a reviewing court will set aside the sentence only if it is reasonably probable that the trial court would have chosen a lesser sentence had it known that some of its reasons were improper." (*People v. Price* (1991) 1 Cal.4th 324, 492.) The court's decision is subject to review for abuse of discretion. (*People v. Sandoval* (2007) 41 Cal.4th 825, 847.)

When imposing the upper term of eight years on count 8, the trial court noted that the trial court had "previously stated the reasons for adopting the aggravated term." The trial court had previously discussed aggravated factors when denying probation. When denying probation, the court stated that it "considered the circumstances in aggravation, which the court believes apply to all of the offenses. The victims in this case were particularly vulnerable, and the defendant took advantage of a position of trust or confidence to complete the offenses." The trial court also found that "defendant did

38

induce others to commit crimes" and "did inflict emotional injury on the victims." The only mitigating factor the trial court found was that defendant had no prior record.

Defendant argues that the trial court failed to state any actual facts upon which it was relying in finding that the victim was particularly vulnerable. But the trial court had discretion to select among the lower, middle, and upper terms "without stating ultimate facts deemed to be aggravating or mitigating under the circumstances and without weighing aggravating and mitigating circumstances." (*People v. Jones* (2009) 178 Cal.App.4th 853, 866.)

Defendant concludes that most likely the court based its finding on the facts that, when defendant committed the oral copulation crime, the victim was under arrest, the victim was under defendant's control, defendant was taking advantage of his position of authority, and he was inducing the victim to commit the crime (bribery). Defendant argues that these facts were already inherent in the commission of the crime and therefore could not support an upper term. Although the trial court could not impose the upper term based on a fact that was an element of the crime under California Rules of Court, rule 4.420(c), the trial court was not prohibited from imposing the upper term based on facts inherent in the crime. Also, factors the trial court relied upon in imposing the upper term, were not elements of the crime of oral copulation under color of authority (§ 288a, subd. (k)). We therefore conclude the trial court did not abuse its discretion in imposing the upper term on count 8.

### B. Sentencing Barred by Section 654

Defendant contends the trial court was barred under section 654 from imposing sentences on counts 2 (sexual battery by restraint), 3 (soliciting a bribe), 7 (soliciting a bribe), and 8 (oral copulation under color of authority).

Section 654 proscribes multiple punishments for a course of conduct that violates more than one statute but constitutes an indivisible transaction. (*People v. Beamon* (1973) 8 Cal.3d 625, 637.) Whether a course of conduct is indivisible under section 654 depends on the intent and objective of the actor. (*Neal v. State of California* (1960) 55 Cal.2d 11, 19.) "If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Ibid.*) Therefore, to permit multiple punishments, the evidence must support a finding that the defendant formed a separate intent and objective for each offense for which he was sentenced. (*Ibid.*) A defendant's intent and objective are factual questions for the trial court (*People v. Adams* (1982) 137 Cal.App.3d 346, 355), which may properly infer a defendant's intent from the circumstances surrounding his act. The standard of review for defendant's appeal is substantial evidence. (*People v. Blake* (1998) 68 Cal.App.4th 509, 512.)

In the instant case, the probation report concludes sentencing on counts 3, 6, 7, and 18 should be stayed under section 654 because the crimes occurred during the commission of counts 2, 5, 8, and 17. The trial court stayed sentencing only on counts 6 and 18 (solicitation to engage in lewd conduct). But contrary to the probation report

40

recommendation, the trial court did not stay sentencing on counts 3 and 7. The court found that the counts 2, 3, 7, and 8 constituted "separate completed offenses."

Defend argues that counts 2 (sexual battery by restraint) and 3 (soliciting a bribe), as to Christina, were part of a single objective. While at the police substation, defendant asked Christina what she was going to do for him, pulled out a camera, put it on the desk, asked her again what she was going to do for him, and told Christina to take off her shirt. When Christina complied, defendant took pictures of her breasts and put his mouth on her breasts. As to counts 7 (soliciting a bribe) and 8 (oral copulation under color of authority), defendant was convicted of asking Jill for sexual favors in return for leniency and receipt of sexual favors, that of oral copulation.

Defendant asserts that the act of asking Christina and Jill what he would receive and the sexual touching of the victims' breasts had the same objective of defendant receiving sexual favors. Therefore the acts were an indivisible transaction, requiring application of section 654. We conclude otherwise. There was evidence that the soliciting a bribe offense (count 3) as to Christina occurred in defendant's patrol car, when defendant told her he would not take her to jail if she did him a personal favor. Christina agreed to do a favor for defendant. On the other hand, count 2, sexual battery by restraint, occurred after commission of the bribery offense, when defendant drove Christina to a mall, took her inside the substation, asked her to take her shirt off, took pictures of her breasts, and put his mouth on Christina's breasts. The bribery offense occurred at a different location than the battery offense and was completed before defendant took Christina to the mall substation and put his mouth on her breasts.

41

We also conclude count 7 (soliciting a bribe) involved a separate objective and course of action than count 8 (oral copulation under color of authority). Count 7 is based on evidence that defendant drove Jill around in defendant's patrol car for about an hour and told her she might go to prison because she had prior theft offenses. Defendant then asked Jill to take pictures of her breasts. Jill complied because she thought it would help her avoid custody. Count 8 was committed afterwards, when defendant drove Jill to another location and defendant, through suggestive behavior, urged Jill to orally copulate him. She did so out of fear of going to prison.

Because the bribery counts (counts 3 and 7) occurred at different times and locations than the crimes in counts 2 and 8, we conclude the trial court did not err in sentencing defendant separately for counts 2, 3, 7, and 8.

## C. Consecutive Sentencing

Defendant contends the trial court abused its discretion in imposing all of the felony sentences consecutively, rather than concurrently. In doing so, the trial court explained: "As far as whether the sentences should be concurrent or consecutive, all of the crimes were predominantly independent of each other and crimes – although they did not involve separate acts of violence or threats of violence, there were some suggestions of retaliation and possible violence. I disagree with that conclusion by the probation department. [¶] The crimes were committed at different times and different places and were not committed so close in time that it would be considered to be situational or just a single period of aberrant behavior. It was a continuing course of conduct over a significant amount of time involving a number of victims. There were numerous victims

42

in the case. [¶] Considering the circumstances in aggravation and circumstances in mitigation, court finds that the circumstances in aggravation outweigh any mitigating factors that may exist. [¶] Court also finds that consecutive sentencing is appropriate for the reasons stated."

Defendant argues, as he did regarding section 654, that counts 2 and 3, and counts 7 and 8 were not crimes of separate objectives or committed at separate times and places. Therefore sentencing should have been imposed concurrently, rather than consecutively. We disagree.

A trial court's imposition of consecutive terms is reviewed for an abuse of discretion. California Rules of Court, rule 4.425(a) lists factors for a trial court to consider when deciding to "impose consecutive rather than concurrent sentences." The factors are: "(1) The crimes and their objectives were predominantly independent of each other; [¶] (2) The crimes involved separate acts of violence or threats of violence; or [¶] (3) The crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior."

When the trial court imposed consecutive sentences, it relied on the factors listed in California Rules of Court, rule 4.425(a). The trial court explained the offenses were independent of each other. They were committed at different times and different places. The crimes were not committed so close in time that it would be considered to be situational or just a single period of aberrant behavior. The court concluded defendant's crimes constituted a continuing course of conduct over a significant amount of time

involving numerous victims.  We conclude the trial court did not abuse its discretion in imposing consecutive sentences.

XI

DISPOSITION

The judgment is affirmed, except as to count 18, which is barred by the statute of limitations.  Defendant's conviction and sentence on count 18 is reversed.  The judgment is affirmed in all other respects.  The judgment accordingly is modified by reversing defendant's count 18 conviction and dismissing that charge.  The trial court is directed to prepare an amended abstract of judgment that reflects the modified judgment and to forward a certified copy to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

McKINSTER
Acting P. J.

MILLER
J.

44